

**WILCOX & FETZER LTD.**

## In the Matter Of:

# Melendez

## v.

# Carroll, et al.

## C.A. # 04-193-SLR

---

## Transcript of:

## Anibal Melendez

## July 14, 2005

---

Wilcox & Fetzer, Ltd.
Phone: 302-655-0477
Fax: 302-655-0497
Email: lhertzog@wilfet.com
Internet: www.wilfet.com

EXHIBIT C

Page 1

```
            IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF DELAWARE

ANIBAL MELENDEZ,                    )
                                    )
            Plaintiff,              )
                                    )
v.                                  )
                                    )
WARDEN CARROLL, LARRY               )  Civil Action No.
MC GUIGAN, NURSE BRYANT,            )    04-193-SLR
LT. STANTON, CPT. MERSON,           )
CPT. SAGAR, NATE GARDELS,           )
CPT. BELANGER, MICHAEL ALLEN,       )
and INTERNAL AFFAIRS,               )
                                    )
            Defendants.             )
```

            Deposition of ANIBAL MELENDEZ taken pursuant to
notice at the Delaware Correctional Center, 1181 Paddock
Road, Smyrna, Delaware, beginning at 10:15 a.m. on
Thursday, July 14, 2005, before Robert Wayne Wilcox, Jr.,
Registered Professional Reporter and Notary Public.
APPEARANCES:

            ANIBAL MELENDEZ (pro se)
            SBI No. 00337929
               Delaware Correctional Center
               1181 Paddock Road
               Smyrna, Delaware  19977
               for himself,

            EILEEN KELLY, ESQ.
            STATE OF DELAWARE DEPARTMENT OF JUSTICE
               820 North French Street - 6th Floor
               Wilmington, Delaware  19801
               for the Defendants.

    ALSO PRESENT:  LISA BARCHI, ESQ.

    ------------------------------------------------------

                     WILCOX & FETZER
       1330 King Street - Wilmington, Delaware 19801
                     (302) 655-0477

Page 2

1           ANIBAL MELENDEZ,
2       the witness herein, having first been
3       duly sworn on oath, was examined and
4       testified as follows:
5    BY MS. KELLY:
6      Q.  Mr. Melendez, my name is Eileen Kelly. I'm from
7    the Department of Justice of the State of Delaware. In
8    this lawsuit I represent a number of individuals that you
9    have sued. Just to be clear, I represent Warden Carroll,
10   Deputy Warden McGuigan, Corporal Lise Merson, Captain
11   Sagers, Officer James Gardels — is that how you
12   pronounce it? —
13     A.  Captain Gardels.
14     Q.  — Captain Joseph Belanger, Internal Affairs and
15   Officer Michael Allen.
16          Those are the only individuals that I
17   represent in this lawsuit. Do you understand that?
18     A.  Yes. I understand that.
19     Q.  Okay.
20     A.  I have a question.
21     Q.  Sure.
22     A.  I did serve you with the — I don't know what
23   happened. I served you with the U.S. Marshal form to the
24   court. And I sent you one. And I got the one you sent

Page 4

1    That's correct.
2      A.  Yeah. That's the one I sent.
3      Q.  But not to me. It goes to Jane Brady. It can't
4    go directly to me.
5      A.  Okay. To Jane Brady. To the Department of
6    Corrections.
7      Q.  The Department of Justice.
8      A.  Yes.
9      Q.  Okay. What's his name? Lieutenant —
10     A.  It was Lieutenant Stanton —
11     Q.  Stanton.
12     A.  — and Nurse Bryant.
13     Q.  The one that was Lieutenant Stanton has to go
14   directly to him here at DCC, not to me.
15     A.  So I have to send him one?
16     Q.  Yes.
17     A.  But I haven't heard from the Court. I haven't
18   got the order from the Court yet.
19     Q.  Right. Because the Court dismissed it because
20   you didn't serve them within the time period. So you're
21   going to have to address that directly with the judge
22   again.
23     A.  Okay.
24     Q.  Okay. One thing I wanted to mention to you — I

Page 3

1    me back.
2      Q.  Right.
3      A.  But they said they never received it there. And
4    they dismissed it.
5      Q.  Right.
6          I understand that you filed something with
7    the court recently about that.
8      A.  Yes.
9      Q.  A letter or something.
10     A.  I filed an amended complaint.
11     Q.  Okay. Yes.
12     A.  Okay. And I haven't heard anything back.
13     Q.  I am not familiar specifically with the process
14   whereby what happens with the court in terms of somebody
15   being served. The paperwork has to be served directly on
16   the individual, not through me. Okay? And that has not
17   happened.
18     A.  Because I did send — I learned that I have to
19   send one to the court —
20     Q.  Right.
21     A.  — and one to you.
22     Q.  Not to me.
23     A.  To the department? No.
24     Q.  Well, one gets sent to the Department of Justice.

Page 5

1    got from you some discovery requests that came —
2      A.  Yes.
3      Q.  — in the mail. Right?
4          It appears to me what you did not do was,
5    when you send those documents to the court, you have to
6    attach a page to the document that says I served this
7    document on Eileen Kelly by placing it in first-class
8    mail.
9      A.  A certificate of service, right.
10     Q.  Yes.
11          Your document, as scanned in by the court,
12   as it showed up electrically, does not have that piece of
13   paper. Okay? So what will probably happen is the Court
14   is going to reject that. Do you understand what I'm
15   saying?
16     A.  Yes.
17     Q.  You need to have a certificate of service.
18     A.  I will serve you again —
19     Q.  Yes.
20     A.  — with the certificate of service.
21     Q.  Do you understand it has to go to the court as
22   well?
23     A.  To the court.
24     Q.  The court has to have the certificate of service.

2 (Pages 2 to 5)

Page 6

1   They need to have proof that you mailed it to me. It's
2   not enough that you mailed it to me. You have to have --
3   **A.  I will serve all parties.**
4   Q.  Yes. The court has to have proof in your writing
5   this that you actually mailed it to me. Okay? Do you
6   understand that?
7   **A.  Yes.**
8   Q.  Okay. The other thing I wanted to discuss with
9   you to make sure that you understand this -- there is a
10  discovery cutoff deadline in the case of July 29th. Do
11  you know that?
12  **A.  Okay. Yes.**
13  Q.  What that means is that that is the deadline for
14  which we exchange information. Okay?
15       Now, you are at this time attempting to ask
16  questions of the people that I represent. All right?
17  When I officially get that in terms of when you served
18  it, I have 30 days to respond. Okay? That 30 days is
19  going to take us beyond the July 29th deadline. Okay?
20       So not only do you have to serve it with a
21  certificate of service, you're going to have to ask the
22  Court to extend the deadline. All right? You're going
23  to have to write to the Court, ask that, state why you
24  want it. And, again, you're going to have to do the

Page 7

1   whole certificate of service thing. It's up to the Court
2   as to whether or not --
3   **A.  To give me the right to.**
4   Q.  Yes. It's entirely up to her. I may or may not
5   oppose your request. I can't tell you that now. I'm not
6   telling you that I agree to such an extension.
7       The other deadline that is in place
8   currently is on August 29. Summary judgment motions are
9   due. A summary judgment is basically me going to the
10  Court and asking the Court to dismiss the case. Okay?
11  **A.  Okay.**
12  Q.  I have until August 29th to do that. You, then,
13  have the right to respond to that.
14  **A.  Mm-hmm.**
15  Q.  Okay?
16  **A.  Yes.**
17  Q.  I want to explain to you what the status of the
18  case is at this time. At this time we don't have a trial
19  date or anything like that. Okay? Do you understand
20  that?
21  **A.  Yes. I understand that.**
22  Q.  When I keep asking you if you understand, I'm
23  doing that because you're here. You don't have a lawyer.
24  **A.  I'm glad you asked.**

Page 8

1   Q.  Okay. So you need to ask me questions. You need
2   to let me know.
3   **A.  Yes.**
4   Q.  Have you ever had your deposition taken before?
5   **A.  No.**
6   Q.  All right. Let me explain how that works.
7       As you can see, Mr. Wilcox is here to take
8   down your testimony. He put you under oath. What that
9   means is that this is your sworn testimony as if you were
10  in a court before a judge and/or a jury. Do you
11  understand that?
12  **A.  Yes. I understand.**
13  Q.  One of the reasons that I want to take your
14  deposition is that at some point in this case we may go
15  to a trial. If we go to a trial, I may go to the Court
16  and say to the Court I want to use parts of
17  Mr. Melendez's deposition as evidence in the case. And
18  it is your sworn testimony as if you had already been at
19  trial.
20       During the course of your deposition, as I'm
21  asking you questions today, you have the right to object
22  to whatever question I ask. You generally are supposed
23  to give some reason as to why you're objecting. Even if
24  you object -- that's fine -- that goes on the record --

Page 9

1   you still need to answer the question.
2       What your objection will do is -- in the
3   event that we are going to trial and we're going to the
4   judge and I'm saying I want this piece of testimony to go
5   before the jury, you can make your argument as to why it
6   should not. Okay? The judge will decide at this time.
7       The fact that I'm asking you questions and
8   you're answering questions today doesn't necessarily mean
9   that anything you say will go before the jury. It will
10  be up to the judge to ultimately decide that. But I am
11  allowed to ask you the questions and you are obligated to
12  answer.
13      There are exceptions to that. At some point
14  you may or may not have had an attorney in unrelated
15  matters. I can't ask you about anything like that, and I
16  wouldn't ask you about that.
17      Do you currently have any open cases
18  pending?
19  **A.  No.**
20  Q.  Okay. If you did, I wouldn't be able to ask you
21  about that either.
22  **A.  And then I also get to review the transcript from**
23  **the deposition.**
24  Q.  Are you asking to do that?

3 (Pages 6 to 9)

Page 10

1   A. Yes.
2   Q. On a related issue -- I'm going to try to explain
3   this to you clearly. When your deposition is taken, you
4   have a right under the law to read through your
5   deposition. If you find any errors, you can mark them
6   down on a piece of paper that will be provided to you,
7   and then you send the paper of errors to Mr. Wilcox.
8   Okay? When you go through and your look at errors --
9   A. Where?
10  Q. The transcript will be coming here.
11  A. Who?
12  Q. Mr. Wilcox is the court reporter?
13  A. The court reporter.
14  Q. When you get the transcript, if you want to do
15  this, it will tell you where to send it on the piece of
16  paper.
17  A. Okay. Thank you.
18  Q. In terms of checking for errors, you're looking
19  for misspellings. You're looking for instances where the
20  court reporter may have misheard what you said.
21  A. Okay.
22  Q. He may not have understood what you said. You're
23  not allowed to rewrite your testimony. You're not
24  allowed to change what you said.

Page 12

1   A. I appreciate that.
2   Q. If you go ahead and answer, I'm going to assume
3   that you understood what I was asking you.
4   A. Okay.
5   Q. The other thing is, if at some time you need a
6   break, let me know, and we can do that.
7   A. Mm-hmm.
8   Q. I'm not sure of how long this is going to take --
9   and I don't know what time you generally eat -- but this
10  is not an endurance test. I'm not requiring you to sit
11  here for hours without food or water or a bathroom break.
12  So you need to let me know if you need to eat. You need
13  to let me know. You would have to be eating when you
14  normally eat. They're not going to bring you food just
15  because you're hungry. I'm sure you understand that
16  that.
17  A. Yes.
18  Q. Okay. Do you have any questions about what I've
19  told you so far.
20  A. No.
21  Q. I'm going to start off by asking you some
22  background questions about yourself.
23  A. Okay.
24  Q. What is your full name?

Page 11

1   A. No.
2   Q. Okay. You have the right to do that -- to read
3   it over and make corrections. You don't have to do it.
4   You need to tell me now whether you want to read it over,
5   make corrections or if you want to --
6   A. Make the corrections and read it over.
7   Q. Now, because Mr. Wilcox is here taking down what
8   we say, he can only write down what one person says at a
9   time. So only one person can talk at a time.
10  A. Okay.
11  Q. All right?
12  A. Mm-hmm.
13  Q. You need to answer audibly. You need to say yes
14  or no or whatever. You can't shake or nod your head. He
15  can't take that down. He needs to have some verbal
16  response.
17  A. Yes. I understand.
18  Q. Okay. If you don't understand what I've asked
19  you, if it is unclear to you, you need to let me know.
20  A. That's okay.
21  Q. If you don't understand and you let me know, then
22  I'll try to rephrase it in a way that you understand, or
23  Mr. Wilcox can go back over the testimony and re-read it
24  to you.

Page 13

1   A. Anibal Melendez.
2   Q. Do you have a middle name?
3   A. No.
4   Q. Okay.
5   A. It's written as a G, but that's not my middle
6   name. That's my last name. It's written as my initial,
7   but it's my last -- in Latin countries we use both last
8   name from father and mother.
9   Q. Right.
10  A. So Garcia is my last name also. It's Anibal
11  Melendez Garcia.
12  Q. Okay. The G comes after the Melendez. Is that
13  right?
14  A. After Melendez. Garcia.
15  Q. Where were you born?
16  A. I was born in Puerto Rico.
17  Q. Okay. When did you come to the United States?
18  A. In 1995.
19  Q. I know. Puerto Rico is part of the
20  United States.
21  A. Yes. I understand. No offense taken.
22  Q. So when you came here in 1995, did you come to
23  Delaware?
24  A. Yes. Wilmington, Delaware.

4 (Pages 10 to 13)

Melendez                              v.                    Carroll, et al.
Anibal Melendez              C.A. # 04-193-SLR              July 14, 2005

Page 14

1    Q. From 1995 to the present, have you lived in
2    Delaware?
3    A. I've been everywhere. I mean, Delaware -- I
4    don't really -- I live here, but I go back to Puerto
5    Rico --
6    Q. Okay.
7    A. -- New York, Philadelphia.
8    Q. Okay. Do you have family residing in Delaware?
9    A. Yes.
10   Q. Who lives here?
11   A. A brother.
12   Q. Do you have parents that are still living?
13   A. No. Yes, yes, yes, yes, yes, yes. My mom and
14   dad. Yes. They in Puerto Rico.
15   Q. My understanding is that, for the period that you
16   are now serving time in prison, you were arrested on
17   April 3rd, 2001 -- April 30th.
18   A. April 30th, 2001. For murder.
19   Q. Have you been in prison since April 30th, 2001?
20   A. Have I been?
21   Q. Have you been in prison?
22   A. Yes. Ever since.
23   Q. Okay. Have you been at DCC the whole time?
24   A. Yes. Well, I was in Gander Hill when I first got

Page 15

1    locked up, and I was sent -- after I was sentenced I was
2    sent to Smyrna.
3    Q. So you were in Gander Hill from the day of your
4    arrest until the time you were sentenced?
5    A. Until the time I was sentenced. I'm sorry.
6    Q. Do you remember when you were sentenced?
7    A. June 14, 2002.
8    Q. You did a plea agreement?
9    A. Plead guilty.
10   Q. How many years have you been sentenced to?
11   A. Forty-eight years total.
12   Q. Do you have a short-term release date?
13   A. No.
14   Q. Okay. Prior to this time period, the beginning
15   of 2001, have you served any other time in prison?
16   A. Yes.
17   Q. When was that?
18   A. '96.
19   Q. What was that charge?
20   A. Assault.
21   Q. Did you plea bargain on that charge?
22   A. Yes.
23   Q. What was your sentence? How many months or
24   years?

Page 16

1    A. It was seven years -- two years Level V followed
2    by probation.
3    Q. Did you serve two years at Level V?
4    A. Excuse me?
5    Q. Did you serve two years at Level V?
6    A. Yes.
7    Q. Where were you?
8    A. Gander Hill.
9    Q. So you were released in '98?
10   A. '98, yes. That's correct.
11   Q. When you were released in '98, did you then live
12   in Wilmington?
13   A. In Wilmington.
14   Q. Were you living in Wilmington until 2001?
15   A. Well, I moved to Newark --
16   Q. Okay.
17   A. -- in '98.
18        And then I came back to Wilmington in 2000.
19   Q. Are you married?
20   A. No. I'm single.
21   Q. Do you have any children?
22   A. No.
23   Q. What's your educational background?
24   A. Twelfth grade.

Page 17

1    Q. Where did you go to high school?
2    A. A.I. duPont High School.
3    Q. Okay. You graduated?
4    A. No.
5    Q. Do you have a GED?
6    A. No.
7    Q. What kind of jobs have you held since you left
8    high school?
9    A. Many.
10   Q. Say that again.
11   A. Many. A lot of jobs.
12   Q. Oh, many.
13   A. Many jobs.
14   Q. Can you just give me an idea of the kind of
15   things you've done?
16        I don't need to know the employers.
17   A. I've done it all -- from chef to mechanic,
18   just -- salesman, construction.
19   Q. In April 2001 did you have a job?
20   A. April 2001? That was my last job as salesman.
21   Q. Okay. Where were you working?
22   A. Pulsar Communications.
23   Q. What were the factual circumstances that led to
24   your arrest on April 30, 2001?

5 (Pages 14 to 17)

Melendez                              v.                    Carroll, et al.
Anibal Melendez                 C.A. # 04-193-SLR                July 14, 2005

Page 18

1   A.  What was the factuals?
2   Q.  Yes.
3   A.  I don't understand.
4   Q.  What happened?
5   A.  It was a confrontation with me and the victim.
6   Q.  With you and?
7   A.  Andrew Mercado, the victim -- the deceased.
8   Q.  Okay.
9   A.  And, you know -- do I have to go into detail?
10  Q.  I guess the victim is a person that you were
11  accused of --
12  A.  Accused of murdering.
13  Q.  You were arrested by the Wilmington Police?
14  A.  No. By New Castle. Well, I was arrested on a
15  different charge --
16  Q.  Okay.
17  A.  -- before I was on charge with murder.
18  Q.  Okay. But this happened in the City of
19  Wilmington. Is that right?
20  A.  The murder?
21  Q.  Yes.
22  A.  Yes.
23  Q.  I noticed that you had a couple of arrests for
24  violation of probation before 2001.

Page 19

1   A.  Yes.
2   Q.  You were on probation --
3   A.  For the first charges.
4   Q.  For your violations of probation, did you ever
5   serve any time in prison?
6   A.  Well, for that -- just -- for violation of
7   probations. Back and forth.
8   Q.  So when you were violated at times, you were then
9   incarcerated?
10  A.  Yes.
11  Q.  Were those periods of incarceration just a matter
12  of months or weeks?
13  A.  Months.
14  Q.  Okay.
15  A.  No more than six months.
16  Q.  If you remember, were you at Gander Hill?
17  A.  At Gander Hill.
18  Q.  Now, when you arrived here at DCC -- and I can't
19  remember when that was. When was that?
20  A.  It was August 30th.
21      How many days we have in August? Thirty or
22  thirty-one?
23  Q.  Thirty-one.
24  A.  August 31.

Page 20

1   Q.  That would have been 2002?
2   A.  2002.
3   Q.  Okay. Now, when you arrived at DCC, where were
4   you housed?
5   A.  The MHU, M-H-U.
6   Q.  Do you remember what building you were in?
7   A.  Twenty-one.
8   Q.  How long did you stay in MHU 21?
9   A.  For seven months.
10  Q.  After that seven months that you were at MHU,
11  then where did you go?
12  A.  To SHU.
13  Q.  Now, why were you moved from MHU to SHU?
14  A.  Don't know. No explanation.
15  Q.  Have you been in SHU since that time?
16  A.  Yes.
17  Q.  When you were originally housed in MHU, were you
18  in a cell by yourself?
19  A.  No. With a cellmate.
20  Q.  I'm not too familiar with the rules over at MHU.
21  A.  You can ask me.
22  Q.  Were you locked down?
23  A.  Locked down. The MHU is just like the SHU, but
24  you have to have -- you get to have a little more

Page 21

1   privileges than the MHU. But it's locked down three
2   hours a day -- I mean three hours a week.
3   Q.  So at MHU you're locked down all the time
4   except --
5   A.  All the time except that three hours a week.
6   Q.  Okay. But you have a cellmate?
7   A.  A cellmate.
8   Q.  So what are the privileges at MHU that aren't at
9   SHU?
10  A.  There you get to come out with others.
11  Q.  So you have recreation with other people?
12  A.  With other people.
13  Q.  Is there any other difference?
14  A.  No. Pretty much the same.
15  Q.  So, otherwise, it's pretty much the same?
16  A.  The same.
17  Q.  Okay. When you're at SHU, do you have cellmates,
18  or are you by yourself?
19  A.  No. You're by yourself.
20  Q.  You have recreation alone?
21  A.  Yes.
22  Q.  How many hours are you allowed out of your cell a
23  week?
24  A.  Three hours a week.

6 (Pages 18 to 21)

Melendez                               v.                        Carroll, et al.
Anibal Melendez                    C.A. # 04-193-SLR              July 14, 2005

Page 22

1    Q.  Do you have any understanding as to why you're
2    still in SHU?
3    A.  No. I mean, they said I'm waiting for a
4    transfer.
5    Q.  Now, do you know how many points you have in
6    terms of your classification?
7    A.  Twelve points.
8    Q.  Okay.
9    A.  That's medium-high security.
10   Q.  That's medium-high?
11   A.  Medium-high, yeah.
12   Q.  Have you had any discussions with your counselors
13   as to when you might --
14   A.  Yeah. They say they don't know.
15   Q.  Is it because they're waiting for space?
16   A.  They say it's space -- a bed -- waiting for a bed
17   available.
18   Q.  Do you have any idea as to how long you've been
19   eligible to leave SHU?
20   A.  How long?
21        I don't understand the question.
22   Q.  Okay. When you were first brought to SHU --
23   A.  Yes.
24   Q.  -- you were going to be in SHU.

Page 24

1    Q.  But do you know --
2    A.  Oh. When?
3    Q.  Yes.
4    A.  I'm sorry. That was when I first came down here
5    in 2002-2003. I can't remember.
6    Q.  When you arrived at Gander Hill in 2001, were you
7    on any kind of medication?
8    A.  No. Not that I remember.
9    Q.  Are you currently on any kind of medication?
10   A.  No.
11   Q.  In 2001 did you have a family doctor?
12   A.  A family doctor? No.
13   Q.  If you had any kind of medical problem, where did
14   you go?
15   A.  To an emergency room.
16   Q.  In your complaint in this case, you mentioned the
17   fact that you were moved from MHU to SHU.
18   A.  Mm-hmm.
19   Q.  Is that one of your claims in this case? Are you
20   complaining about that?
21   A.  No.
22   Q.  Okay.
23   A.  No.
24   Q.  I just want to be clear.

Page 23

1         You couldn't leave SHU?
2    A.  Yeah. I couldn't.
3    Q.  It seems like now you're eligible -- that you
4    have the kind of points where you could leave SHU.
5    A.  Okay. I understand now. Over -- well,
6    altogether, it's been over a year.
7    Q.  Over a year?
8    A.  Over a year. I was supposed -- I had all the
9    points needed to be out of the SHU over probably like a
10   year, but I was classified like five months ago to leave.
11   Q.  So is it correct that to this date nobody told
12   you why you were moved to SHU?
13   A.  No. It's not.
14   Q.  Okay. Since you've been here at DCC, have you
15   ever had a positive drug screen?
16   A.  A drug screen?
17   Q.  Yes.
18   A.  No.
19   Q.  You do get screened periodically. Right?
20   A.  No. I've had one since I've been in this prison.
21   Q.  You've been screened once?
22   A.  Once.
23   Q.  Do you remember when that was?
24   A.  Negative.

Page 25

1         Are you seeking damages for the fact that
2    you were moved from MHU to SHU?
3    A.  No.
4    Q.  Now, I understand that your lawsuit concerns
5    claims that you were assaulted by certain officers. Is
6    that correct?
7    A.  Yes, that's correct.
8    Q.  What I want you to do now is to explain to me
9    what happened and what your claim is.
10   A.  Okay. Well, sometime in December I had a dispute
11   with Mr. Gardels.
12   Q.  Okay. Stop for a second.
13        December of what year?
14   A.  Of 2003. Yes, 2003.
15   Q.  When did you file your suit?
16   A.  Right after. Two months after.
17   Q.  All right. Sometime in December of 2003. Right?
18   A.  2003.
19        I had a dispute with Mr. Gardels over the
20   food tray.
21   Q.  Now, is that Gardels?
22   A.  Gardels.
23   Q.  Go ahead.
24   A.  Later on after that dispute, Gardels came in the

7 (Pages 22 to 25)

Page 26

1  cell, companioned by Mr. Allen, and they attacked me.
2  And after the attack took place, they left the place and
3  returned back.
4      Q.  They left your cell?
5      A.  They left the cell and closed the door and just
6  left me there.
7      Q.  So they did not come back?
8      A.  They did not come back.
9      Q.  Do you remember when this was other than it was
10 in December?
11     A.  Right now I don't have any paperwork on me.
12     Q.  Okay.
13     A.  I don't want to give you the wrong date.
14     Q.  That's fine.
15         Do you remember what the dispute over the
16 food tray involved?
17     A.  He wasn't giving me any bread --
18     Q.  Okay.
19     A.  -- that I was entitled to have.
20     Q.  Now, this incident with the food tray involved --
21 is it Gardels or --
22     A.  Gardels.
23     Q.  Okay. It involved him only. Right?
24     A.  Yes.

Page 27

1      Q.  Was he the only officer?
2      A.  Yes. It was him only.
3      Q.  Now, prior to this incident in December, had you
4  had any other problems or incidents with Gardels?
5      A.  Yes. Right after that it happens again, because
6  he was -- it was day that he didn't give me any food.
7  And right after that he didn't give me any food. But
8  there was not no physical incident. He just didn't feed
9  me.
10     Q.  So you're saying that sometime after the incident
11 with the bread there was another occasion where he didn't
12 feed you at all?
13     A.  He didn't feed me at all.
14     Q.  Okay. When we're talking about the incident with
15 the bread and there was some dispute, you were in your
16 cell. Right?
17     A.  I was inside my cell in the SHU, upper 11. They
18 have a flap.
19     Q.  Right.
20     A.  They open the flap and put the tray in the flap
21 while you are in the cell.
22     Q.  I guess he put the tray through there.
23     A.  Yeah. Through there without the bread.
24     Q.  You said something about that?

Page 28

1      A.  I asked him, "Where is my bread?"
2      Q.  What did he say?
3      A.  "You're beat. No bread."
4      Q.  What does that mean? What did you understand
5  that to mean?
6      A.  You're beat. You know, there ain't no bread for
7  you. I'm not going to give you any bread.
8      Q.  What did you say, if anything?
9      A.  I said I'm entitled to have my bread.
10         He said, "No, you don't." And he left.
11     Q.  Was there any physical contact between you and
12 Gardels?
13     A.  No. Not -- prior to that?
14     Q.  While you were talking about the bread.
15     A.  No.
16     Q.  Okay.
17     A.  There's a wall in between and a door, and you can
18 only have -- I can only put my face in there to speak to
19 him.
20     Q.  Okay. So there's a flap in the door for putting
21 a tray through. Is that right?
22     A.  On the side of the door in the wall.
23     Q.  Oh. It's not in the door. It's on the wall.
24     A.  It's not in the door.

Page 29

1      Q.  It's next to the door?
2      A.  Next to the door.
3      Q.  If you can estimate, about how wide is the flap?
4      A.  From here to here.
5      Q.  Is it more than a foot wide?
6      A.  About a foot. Yeah, about a foot wide. And
7  about three inches --
8      Q.  Tall?
9      A.  -- tall.
10         Long.
11     Q.  There's a little door on the flap that you have
12 to open. Right?
13     A.  Yeah. There's a door.
14     Q.  That you lift up?
15     A.  Lift up and pull down.
16     Q.  All right. Can you fit your hand through that
17 flap?
18     A.  Yes. I can stick both my hands.
19     Q.  Okay.
20     A.  But it's kind of high. It's kind of like -- it
21 go to -- I can reach over.
22     Q.  Would you say it's at your chest level -- the
23 flap?
24     A.  Yes.

8 (Pages 26 to 29)

Melendez                          v.                          Carroll, et al.
Anibal Melendez               C.A. # 04-193-SLR                July 14, 2005

Page 30

1    Q. How tall are you?
2    A. Five-ten.
3    Q. Okay. Is it right that sometimes you need to put
4    your hands through the flap to get handcuffed?
5    A. To get handcuffed? No. They make you turn
6    around. They put a pipe on that flat -- put a pipe in
7    there so that the door won't allow to be open wide. It
8    just opens enough that you can turn around and put the
9    handcuffs on you behind your back.
10   Q. So you turn around and put your hands up to the
11   flap?
12   A. To the door.
13   Q. The door or the flap?
14   A. To the door.
15   Q. Okay.
16   A. Let me explain to you. I'll explain to you.
17   When the door -- the flap has a small pipe sticking out.
18   Can I draw it?
19   Q. Sure.
20   A. This is the cell door.
21   Q. And there's the window.
22   A. The door slides this way. And there's a flap on
23   the wall right here.
24   Q. So the door slides open?

Page 31

1    A. The door slides open.
2    Q. Okay.
3    A. And there's a little handle right here.
4    Q. On the flap?
5    A. On the flap that you can pull open or down.
6    Q. Right.
7    A. So they put a pipe sticking out right here.
8    Q. Mm-hmm.
9    A. So it won't let -- allow to door to slide over.
10   Q. Oh. So the door slides open only a little bit?
11   A. To -- enough for them to put the handcuffs behind
12   your back.
13   Q. Okay. So you go up to the small opening in the
14   door --
15   A. Yes.
16   Q. -- and put your hands behind your back?
17   A. Yes. And they put the handcuffs. And then they
18   take the pipe out.
19   Q. Okay.
20   A. And they slide the door.
21   Q. I understand.
22   A. You understand?
23       MS. KELLY: Okay. All right. Do you want
24   to mark that as Exhibit 1?

Page 32

1        (Melendez Deposition Exhibit No. 1 was
2    marked for identification.)
3    BY MS. KELLY:
4    Q. All right. To get back to the incident with
5    Gardels and the bread, what meal was this, do you
6    remember?
7    A. Lunch.
8    Q. About what time do you have lunch?
9    A. About 12:00.
10   Q. Okay.
11   A. Sometime 11:30.
12   Q. You're given the tray. Then when you're done
13   eating, how do you give the tray back?
14   A. You just leave it in there -- in the flap.
15   Q. Okay.
16   A. The flap have -- inside have like another.
17   Q. A shelf?
18   A. A shelf that like three -- like about six
19   inches -- the cell that you can just -- they put it in.
20   And then you eat. And then you just put it right back in
21   there. They open the flap. They just take the tray and
22   close the flap.
23   Q. Okay. Now, I believe you testified that sometime
24   after the dispute over the bread Gardels returned to your

Page 33

1    cell. Is that what you said?
2    A. Yes.
3    Q. Was that the same day?
4    A. The same day. Like half an hour later.
5    Q. Was your tray still at the flap?
6    A. No. They collect the trays -- the whole tier's
7    trays. There's 24 cells in the tier -- 12 upstairs and
8    12 downstairs.
9    Q. Now, Gardels gave the trays at lunch?
10   A. Yeah. Gardels gave all the trays, right.
11   Q. Did he take them back?
12   A. Yes.
13   Q. Okay.
14   A. He collect them back.
15   Q. Do you know how many officers are assigned to a
16   tier, you know, around that time of the day at lunchtime?
17   A. No.
18   Q. Okay.
19   A. I don't know.
20   Q. On this day in December when the incident
21   happened with Gardels, did you know who he was?
22   A. Yes. As "Nuke." As "Nuke." Everybody know him
23   as "Nuke."
24   Q. "Nuke"?

9 (Pages 30 to 33)

Case 1:04-cv-00193-SLR    Document 72-4    Filed 02/24/2006    Page 12 of 36

Melendez                                    v.                        Carroll, et al.
Anibal Melendez                        C.A. # 04-193-SLR                July 14, 2005

Page 34

1    A. "Nuke," yes.
2    Q. N-u-k-e.
3    A. N-u-k-e.
4    Q. Okay. Now, when you say he was known as "Nuke,"
5    when inmates were talking to one another, is that what
6    they would call him?
7    A. Yes. "Nuke."
8    Q. Okay.
9    A. That's the only thing I knew of him -- was
10   "Nuke."
11   Q. So you didn't know his last name?
12   A. Gardels.
13   Q. Okay.
14   A. He don't wear no identification on anything.
15   Q. Okay. Do any of the officers wear
16   identification?
17   A. Not most of them, no.
18   Q. What does Officer Gardels look like?
19   A. He's a white male, about five-six, about 165
20   pounds, short haircut, brunette, a round face, green
21   eyes.
22   Q. You've already told me this, but I can't find it
23   in my notes. As of December 3rd, how long have you been
24   in SHU?

Page 35

1    A. I just got off of -- I still -- I was in the MHU,
2    but it was still in the same conditions. For the SHU
3    it's been over two and a half years. About two and a
4    half years that I was in the SHU.
5    Q. Okay. What I'm asking you is: When the bread
6    incident happened, how long had you been on SHU?
7    A. After?
8    Q. No.
9    A. Before?
10   Q. On the day that the bread incident happened, you
11   were in SHU.
12   A. Yeah. I was in SHU at that time.
13   Q. How long had you been in SHU?
14   A. Altogether?
15   Q. No. As of that date.
16   A. As of that date? That happened in December. I
17   just got off that building two months ago. Well, you
18   know, I can't really put that together.
19   Q. Let me tell you this.
20        It looks like from my records that you were
21   moved to SHU in February of 2003.
22   A. To the SHU?
23   Q. Yes, to the SHU.
24   A. February? Okay. 2003. Okay. Yes. That's

Page 36

1    correct.
2    Q. Okay. When you were moved to SHU in February,
3    you were put in Building 17?
4    A. Yes. C tier.
5    Q. C tier.
6        Did you stay on C tier until December of
7    2003?
8    A. I left that tier -- I think it was February of
9    2004 --
10   Q. Okay. So when --
11   A. -- to another tier in the same building.
12   Q. Now, a tier is what you described to us where
13   there's 12 cells on top and 12 cells on the bottom?
14   A. Yes, ma'am.
15   Q. So you arrived on Tier C in February of 2003?
16   A. 2003.
17   Q. Do you remember whether Gardels was an officer on
18   Tier C at that time?
19   A. Was he on the tier?
20   Q. When you arrived.
21   A. Yes, he was.
22   Q. All right. So you had seen him around on the
23   tier the whole time you had been there?
24   A. Yes. That's correct.

Page 37

1    Q. As of the time of the bread incident, in your
2    opinion, did Officer Gardels have a reputation on the
3    tier?
4    A. Yes.
5    Q. What was that reputation?
6    A. He's like a bully.
7    Q. Okay. What was that reputation based on, if you
8    know?
9    A. Of playing with the food and just -- like mostly
10   it's not giving the people the privileges they're
11   supposed to have.
12   Q. Can you give me an example?
13   A. Like if you suppose to go off to recreation, you
14   won't get no recreation. There's no say. You won't.
15   Q. Prior to the incident with the bread, had you had
16   any other bad experiences with him?
17   A. Actually, yes.
18   Q. Do you remember when about that happened?
19   A. When? Sometime before December.
20   Q. Okay.
21   A. November. I can't remember when.
22   Q. That's fine.
23        What happened?
24   A. He won't -- he didn't gave me no any food.

10 (Pages 34 to 37)

Case 1:04-cv-00193-SLR    Document 72-4    Filed 02/24/2006    Page 13 of 36

Melendez                                    v.                          Carroll, et al.
Anibal Melendez                    C.A. # 04-193-SLR                    July 14, 2005

Page 38

1   Q. So it was another food-related problem?
2   A. Yeah.
3   Q. Do you remember if you had any other problems
4   with him before December?
5   A. Yeah. About the food and -- oh. And recreation.
6   Q. Okay. So you had had problems with him before
7   December --
8   A. Yes.
9   Q. -- where he was either not giving you the food
10  you're supposed to get --
11  A. Or recreation.
12  Q. -- or not letting you have recreation?
13  A. Yes.
14  Q. I don't know whether you can even observe this
15  based on what the tier looks like. But could you tell
16  whether any of the other inmates had kind of similar
17  situations with him?
18  A. I think, if I pull out the discovery, there would
19  be many, many inmates related to the same incident.
20  Q. Okay. On your tier at that time, on Tier C, are
21  you able to speak with other inmates on the tier?
22  A. Yes. You can speak to others.
23  Q. Have you ever had any conversation about Gardels
24  with other inmates?

Page 39

1   A. Not -- you can pretty much hear for yourself.
2   You're in the tier. The tier is like this square table.
3   And then the cells are around. And you can hear pretty
4   much everything what's going on the tier.
5   Q. So if Gardels had some --
6   A. Confrontation with another inmate.
7   Q. You'd be able to hear?
8   A. You can hear.
9   Q. So you had heard that kind of thing before?
10  A. Before.
11  Q. So do you feel like he was kind of singling you
12  out or he treated everybody the same?
13  A. No. He don't -- he just -- certain people that
14  he treat like that.
15  Q. Would you say that there were certain people that
16  he was nicer too?
17  A. No. Not nice. He's not nice with no one.
18  Q. Okay.
19  A. But certain -- when he pick on someone, he just
20  pick on that person.
21  Q. Did you feel that he picked on you?
22  This is before you --
23  A. Before the incident.
24  Q. Did you feel like he picked on you?

Page 40

1   A. Yes. He would be picking on me.
2   Q. Okay. Do you have any idea as to why he would
3   pick on you as opposed to somebody else?
4   A. Not that I can remember right at this point.
5   Q. Let's go back to the day where you had the
6   dispute with him over your food. Now, I think what you
7   said is he came back about a half-hour later.
8   A. Yes.
9   Q. What happened then?
10  A. He opened the door wide open and told me to shake
11  down. And when I went to -- I was in my underpants. And
12  I went to turn around to put this -- not this. But it's
13  a jumper. Before this came it was a jumper. He told me
14  to turn around and to be handcuffed to get shaked down.
15  So when I went to turn around to grab the jumper, he came
16  in and attacked me.
17  Q. Was it unusual to have your cell shaken down on
18  that tier?
19  A. It happens. But most likely no. It depend on
20  the shift. Some shift they do on a regular, and some
21  shift, like day shift, they more busy.
22  Q. Okay.
23  A. So they don't do it much unless there is
24  trouble -- if there is a problem.

Page 41

1   Q. So they'll do them randomly?
2   A. Randomly, yes.
3   Q. But it's usually not during the day?
4   A. No.
5   Q. All right. So he came back and opened the cell
6   door all the way?
7   A. All the way, yes.
8   Q. Did he enter the cell?
9   A. No. He was still outside --
10  Q. Okay.
11  A. -- the cell.
12  Q. He told you he was going to shake down your cell?
13  A. Yes.
14  Q. Do you know, when the cell door opened, was he
15  there by himself?
16  A. No. He was companioned by another officer --
17  Allen.
18  Q. When he told you that he was going to shake down
19  your cell, did he say anything else?
20  A. No.
21  Q. Did he tell you to get out of the cell?
22  A. Well, when they -- usually when they tell you to
23  shake down, you have to get dressed properly and turn
24  around to the door.

11 (Pages 38 to 41)

Melendez                                    v.                           Carroll, et al.
Anibal Melendez                    C.A. # 04-193-SLR                      July 14, 2005

Page 42

1    Q.  To get handcuffed?
2    A.  To get handcuffed.
3    Q.  Okay.  So it sounds like what you're saying is
4    that you turned your back to him to get your jumper.  Is
5    that right?
6    A.  Yes.
7    Q.  Did you get a chance to actually pick up your
8    jumper?
9    A.  No.  When I went to reach for it, that's when he
10   came in.
11   Q.  So he entered your cell when you turned around or
12   after you turned?
13   A.  After I turned around.
14   Q.  Then what happened?
15   A.  He attacked me from the back.
16   Q.  What exactly did he do?
17   A.  He hit me.  He punched me.
18   Q.  What part of your body did he punch?
19   A.  The back of the -- on the back -- the neck.  By
20   the head.
21   Q.  On the back of your head?
22   A.  Yeah.  Neck and head.  Like this area.
23   Q.  Do you know what part of his body he used to hit
24   you?

Page 43

1    A.  His fist.
2    Q.  His fist?
3    A.  Yes.
4    Q.  All right.  So he hit you on the back of the
5    neck.  Did you stay standing when he did that?
6    A.  No.  I fell down.
7    Q.  So you fell down to the ground when he hit you.
8        When you fell down, did you land actually on
9    the ground or on your bunk?
10   A.  No.  On the ground.  On the ground.
11   Q.  Is it a concrete floor in there?
12   A.  Yes.
13   Q.  When you went down to the ground, what part of
14   your body hit the ground, if you remember?
15   A.  Like he -- I'm standing right here.
16   Q.  Okay.
17   A.  I'm standing right here to get handcuffed.  And
18   the door is right there.  When he hit me, I just went
19   forward.  I hit the ground.  I can't remember exactly
20   what position I hit the ground.  I went forward.  I went
21   forward.  I put my hands down.  And forward.
22   Q.  Okay.  You were not cuffed at that time?
23   A.  No, I wasn't.
24   Q.  Did your face hit the ground, if you remember?

Page 44

1    A.  No.
2    Q.  Did you block your fall with your hand?
3    A.  Yeah.  Like I fell down like my -- yeah.  Yeah.
4    Normally.
5    Q.  Did you land on your side?
6    A.  On the side, yes.
7    Q.  Do you remember what side of your body?
8    A.  It would be left.
9    Q.  So he punched you and you fell down.
10       Then what happened?
11   A.  The other officer came in.
12   Q.  Okay.  That would be Allen?
13   A.  Allen.
14   Q.  He entered your cell as well.
15       Were you still on that ground when that
16   happened?
17   A.  Yes.
18   Q.  Then what happened?
19   A.  I turn around.  I slide down.  My back is on the
20   ground.
21   Q.  So you rolled over onto your back?
22   A.  Yeah.  I rolled over onto my back.
23   Q.  Okay.
24   A.  And they start hitting me.  They started kicking

Page 45

1    me.  They started hitting me in the face.  They hit me in
2    the face a couple times.  They kick me on the low body.
3    They was -- they would kneel me down.  I was laying on
4    the ground.  And they was like hitting me, kicking me
5    for, you know, a few minutes.
6    Q.  You rolled over onto your back?
7    A.  Yes.
8    Q.  Did you get up at all?
9    A.  No.  I couldn't get up.
10   Q.  You were still on your back?
11   A.  Yes.  I was down a long time on my back.
12   Q.  Had you ever seen Officer Allen before?
13   A.  Yes.
14   Q.  Did you know his name at that time?
15   A.  Well, he left the ID --
16   Q.  Okay.
17   A.  -- inside the cell.
18   Q.  You mean he was wearing ID or it dropped?
19   A.  Yeah.  He dropped an ID.
20   Q.  Okay.  So it fell off his uniform?
21   A.  It fell off his uniform.
22   Q.  But you had seen him on the tier before?
23   A.  I seen him -- yes.  I had seen him before.
24   Q.  What did he look like?

12 (Pages 42 to 45)

Melendez                                        v.                          Carroll, et al.
Anibal Melendez                          C.A. # 04-193-SLR                  July 14, 2005

Page 46

1   A.  He's about 6-5.
2   Q.  So very tall?
3   A.  Real tall and muscular, black, about 230
4   pounds -- 250 pounds.
5   Q.  Had you ever had any problems with CO Allen
6   before this?
7   A.  No.
8   Q.  Did he have any kind of reputation on the tier?
9   A.  Not that type of reputation.
10  Q.  Okay. When Gardels and Allen entered your cell
11  and you were on the ground, did they say anything to you
12  at all?
13  A.  No.
14  Q.  Did you say anything to them?
15  A.  No.
16  Q.  I believe what you said is when the two of them
17  entered they hit you. Is that right?
18  A.  Yes.
19  Q.  Was that with their fists?
20  A.  Fists, yes. Fists and boots.
21  Q.  So they punched you?
22  A.  They punched me.
23  Q.  Do you remember what part of your body was
24  punched?

Page 47

1   A.  The face and head.
2   Q.  Face and?
3   A.  Head.
4   Q.  Head?
5   A.  Yeah.
6   Q.  Do you remember how many times you were punched
7   approximately?
8   A.  No.
9   Q.  You said that they kicked you also?
10  A.  Mm-hmm.
11  Q.  Do you remember what part of your body was
12  kicked?
13  A.  Yes. Lower.
14  Q.  Lower?
15  A.  Between the chest and abs. The abs, the ribs.
16  Q.  Did they kick you actually on your chest -- the
17  top of your body?
18  A.  In my ribs.
19  Q.  Okay. So it was on the side?
20  A.  On the side.
21  Q.  You're pointing to your right side. Is that the
22  side?
23  A.  Yeah. No. My left side.
24  Q.  Do you remember how many times you were kicked?

Page 48

1   A.  No.
2   Q.  Was it both officers that punched and kicked you?
3   A.  Both.
4   Q.  Would you say that one officer hit you more than
5   the other, or was it about the same?
6   A.  No. About the same.
7   Q.  Do you have an idea of how long this incident
8   took?
9   A.  A few minutes. Six minutes. Around six minutes.
10  Five, six minutes. I can't really remember.
11  Q.  All right. At some point they stopped hitting
12  and kicking you. Right?
13  A.  Yes.
14  Q.  Then what happened?
15  A.  Officer Gardels got up first. And at this time I
16  was laying sideways. And Officer Allen had his knees
17  against my neck. And he holded me down while Mr. Gardels
18  exited the cell first. And then he got up and exited the
19  cell.
20  Q.  Did they say anything to you at this point when
21  they were leaving?
22  A.  No. They said nothing.
23  Q.  Okay. So it sounds like they didn't say anything
24  through the whole process.

Page 49

1   A.  Well, he may have said when I was on the
2   ground -- I can't remember exactly what he said, but he
3   said a word or two. But I can remember -- I wasn't
4   hearing anything. I can't really remember exact words
5   that he said, but he may have said a word. But I can't
6   remember right now.
7   Q.  Would that have been Gardels that might have said
8   something?
9   A.  Gardels.
10  Q.  Okay.
11  A.  He make a noise like (indicating).
12  Q.  All right. So they both exited your cell. I
13  guess they closed the door.
14  A.  Closed the door.
15  Q.  Prior to this accident, before this happened to
16  you, did you ever hear anything on the tier similar to
17  this where Gardels entered another inmate's cell and hit
18  them or kicked them?
19  A.  No.
20  Q.  Okay.
21  A.  No.
22  Q.  After they left and your cell door was closed,
23  then what happened?
24  A.  They left. They just left. They left me there.

13 (Pages 46 to 49)

Page 50

1   Q. You were there by yourself?
2   A. Yes.
3   Q. On SHU what is the process where you ask to see
4   medical? What do you do?
5   A. When the nurse come around twice a day -- they
6   come around in the morning, at three o'clock in the
7   morning, and then come around again about
8   three o'clock in the afternoon.
9   Q. Now, when a nurse comes around, does she go to
10  every cell?
11  A. To serve medication.
12  Q. All right. So she comes to give people
13  medication?
14  A. Yes.
15  Q. If you don't get medication, does she come to
16  your cell anyway?
17  A. She would pass by.
18  Q. So she would walk by?
19  A. She walk by. She can walk by.
20  Q. So --
21  A. At that time I was receiving medication.
22  Q. Oh. Do you remember what for?
23  A. It was some type of medication for prostate.
24  Q. Okay. So from what you said, it sounds like this

Page 51

1   incident with Allen and Gardels happened -- I don't
2   know -- like 12:00 or 1:00, you know, midday.
3   A. Yeah. In the midday.
4   Q. Did a nurse come by your cell?
5   A. Around 3:00.
6   Q. 3:00.
7   When did you get your medication? Did you
8   get it once a day? Twice a day?
9   A. Twice a day -- 3:00 in the morning and 3:00 in
10  the afternoon.
11  Q. So on this day that the assault happened, did she
12  come by your cell at about three o'clock?
13  A. In the afternoon. In the p.m.
14  Q. Do you remember what nurse it was?
15  A. Bryant.
16  Q. Oh, okay. Nurse Bryant?
17  A. Bryant, yes.
18  Q. You had seen this nurse before?
19  A. Yes.
20  Q. It was a woman?
21  A. Yes.
22  Q. Is she the first person that came by your cell
23  after the assault?
24  A. Well, Gardels came around to do count.

Page 52

1   Q. Okay. When did count take place?
2   A. About before 3:00. A little shortly before 3:00.
3   Q. On SHU what does count involve?
4   A. Head counts every code red. Code red is where
5   the prison -- the whole prison is supposed to do
6   counts -- head counts for every inmate.
7   Q. Do you exit your cell during count?
8   A. Excuse me?
9   Q. Do you leave your cell during count?
10  A. No. You -- they go cell by cell -- count the
11  inmates inside the cell.
12  Q. So they just look in through the window?
13  A. In the window.
14  Q. I guess to make sure you're there.
15  A. Yeah.
16  Q. On the day that we're talking about, did Gardels
17  do count?
18  A. Yes. He did the last count.
19  Q. Okay. This would have been sometime before 3:00?
20  A. Before 3:00.
21  Q. Is 3:00 when the shift changes?
22  A. Before. But they be out of there by 3:00. They
23  be out of the building. Every shift changes from 8:00 in
24  the morning to 4:00, from 4:00 to 12:00, and 12:00 to

Page 53

1   8:00.
2   Q. Okay. So Gardels looked into the window at you
3   during count on that day?
4   A. Yeah.
5   Q. Did you see him looking at you?
6   A. Yeah.
7   Q. Okay. After Gardels and Allen left the cell and
8   you were lying on the floor -- is that right?
9   A. Yeah.
10  Q. I'm talking after the assault and they left.
11  A. After the assault I was laying on the floor.
12  Q. At some point did you get up?
13  A. Yes. I got up.
14  Q. Do you remember how long it was before you got
15  up?
16  A. A few minutes.
17  Q. When you got up, what did you do?
18  A. I just washed my face and put my hair back. My
19  hair was out. They pulled my hair out. So I had to put
20  my hair back in a ponytail and wash my face. I took a
21  bath. I washed my body.
22  Q. Okay. Then what did you do?
23  A. Excuse me?
24  Q. Then what did you do? Did you lie down?

14 (Pages 50 to 53)

Melendez                              v.                    Carroll, et al.
Anibal Melendez              C.A. # 04-193-SLR              July 14, 2005

Page 54

1    A.  I just sat on the bed.
2    Q.  How were you feeling at that point?
3    A.  I was feeling -- after a few minutes after the
4    incident, I was feeling better.
5    Q.  Were you in pain?
6    A.  Yes. A little.
7    Q.  When Gardels came by to do the count, did you say
8    anything to him?
9    A.  No.
10   Q.  Did he say anything to you?
11   A.  He said -- he looked in. He said, "Are you all
12   right? You all right? Okay. That's what I thought."
13   And he just walked away.
14   Q.  When he asked you if you were all right, did you
15   say anything?
16   A.  No. I didn't say nothing at all.
17   Q.  All right. So about 3:00 Nurse Bryant came by to
18   give you your medication. Is that right?
19   A.  Yes.
20   Q.  When she brings medication, does she pass it
21   through the flap?
22   A.  Through the flap.
23   Q.  Okay.
24   A.  She opened it. She come with a companion -- with

Page 55

1    an officer.
2    Q.  Oh.
3    A.  They open the flat for her.
4    Q.  So she doesn't come around by herself?
5    A.  No.
6    Q.  Do you remember on that day what CO was with her?
7    Do you remember on that day what officer was with her?
8    A.  No, I don't remember.
9    Q.  It wasn't Gardels?
10   A.  No, it wasn't Gardels. It was a different shift.
11   Q.  Oh, okay.
12   A.  Well, strike that. I can't really remember the
13   same shift, different shift. Different -- it wasn't
14   Gardels.
15   Q.  It wasn't Allen, either?
16   A.  It wasn't Allen.
17   Q.  So the officer opens the flap.
18       Does the nurse pass you the medicine?
19   A.  Yes.
20   Q.  In a little paper cup?
21   A.  Yes.
22   Q.  Does she give you water?
23   A.  No. I have a sink right there.
24   Q.  Now, when Bryant came by to give you your

Page 56

1    medicine on that day, did you have any discussion with
2    her?
3    A.  Yes. I informed her of the incident.
4    Q.  Okay. Did you tell her who was involved?
5    A.  No. At that time I didn't mention any name.
6    Q.  What did you tell her exactly?
7    A.  I just told her -- when she came by, I said I
8    need to see the nurse. I need to see -- I need medical
9    attention. And she said, "Why?"
10       And I said I've been assaulted by two
11   officers.
12       And she said -- well, she looked at me. She
13   saw some bruises on my face and said, "Well, I don't
14   believe you. Let me go and inform Lieutenant Stanton."
15   Q.  Now, at that time you had bruises on your face?
16   A.  Yes.
17   Q.  Did you notice when the bruises appeared?
18   A.  Right away.
19   Q.  Do you have a mirror in your cell?
20   A.  Excuse me?
21   Q.  Did you have a mirror in your cell?
22   A.  Yes.
23   Q.  Okay. Whereabouts on your face were the bruises
24   located?

Page 57

1    A.  On this -- on my right side of my face.
2    Q.  You're pointing to your forehead or your cheek?
3    A.  This. All this side here from my temple area.
4    My forehead.
5    Q.  Ordinarily, not on this day, if you wanted to go
6    to medical, you would tell the nurse who gave you your
7    medicine?
8    A.  You have to put in a sick call slip.
9    Q.  How do you get a sick call slip?
10   A.  From the officer.
11   Q.  So --
12   A.  The tier officer.
13   Q.  If you want to talk to a tier officer on SHU,
14   what do you do?
15   A.  They come around to do counts.
16   Q.  Okay.
17   A.  They come around. Like four times -- a few times
18   a day.
19   Q.  So when they come around, that's when you --
20   A.  You ask them. You request for a medical -- I
21   mean a medical --
22   Q.  Okay.
23   A.  A sick call slip.
24   Q.  Once you prepare your sick call slip, then what

15 (Pages 54 to 57)

Page 58

1   do you do with it?
2   A. You give it back to the officer.
3   Q. Okay.
4   A. They put it in the mailbox.
5   Q. Now, Nurse Bryant said that she was going to talk
6   to Lieutenant --
7   A. Lieutenant Stanton.
8   Q. Who is he?
9   A. He was the lieutenant in charge. At that time --
10  let me make a correction. At that time it was already
11  changed.
12  Q. Okay.
13  A. Because Lieutenant Stanton is from 4:00 to 12:00.
14  So she -- it must be a little after 4:00, to make a
15  correction, because she requested to speak to a
16  lieutenant at 4:00 to 12:00.
17  Q. After she said that to you -- that she would talk
18  to Lieutenant Stanton -- I guess she walked away at that
19  point. Is that right?
20  A. Yes. She like -- she looked at me. She said, "I
21  see the bruises, but I don't believe you. I'll inform
22  Lieutenant Stanton" and left.
23  Q. All right. Did someone come talk to you?
24  A. Lieutenant Stanton came and talked to me.

Page 59

1   Q. How much time was it after that?
2   A. About -- before he went home. I think it was
3   about eleven o'clock, midnight.
4   Q. It was late evening?
5   A. Late evening, yeah.
6   Q. Okay. Lieutenant Stanton came by to talk to you?
7   A. Yes.
8   Q. What happened?
9   A. She asked me to see -- he asked me to show him
10  the bruises. I show him the bruises. I took my shirt
11  off. I showed him the bruises on my body, my face. And
12  he was like "okay" and walked away.
13  Q. Did he open the door or just look through the
14  window?
15  A. Through the window.
16  Q. You had bruises elsewhere on your body?
17  A. Excuse me?
18  Q. You told us you had --
19  A. Yeah. I showed him the bruises on my body.
20  Q. Okay. Earlier you were showing me where you had
21  bruises. Was that on the --
22  A. On the face.
23  Q. What side?
24  A. To who? The nurse?

Page 60

1   Q. You showed it to Nurse Bryant. Right?
2   A. Just the face.
3   Q. What side of your face was it?
4   A. My forehead, my side.
5   Q. Was it the right side of your face?
6   A. This side. Right here. The right side.
7   Q. Okay.
8   A. That's my right side. And then on my forehead.
9   Q. Now, when Lieutenant Stanton came by, you showed
10  him bruises on other parts of your body?
11  A. Yeah. I took my shirt off.
12  Q. Okay.
13  A. I showed him my back. My back was bruised up and
14  my sides.
15  Q. What side of your body was bruised up?
16  A. I think both sides.
17  Q. Okay.
18  A. This -- both sides. And my back.
19  Q. You took off your shirt and showed him that?
20  A. Yes.
21  Q. You showed him your bruises?
22  A. Yes.
23  Q. What did he say?
24  A. He said okay.

Page 61

1   Q. Then he left?
2   A. Then he left.
3   Q. Did a nurse come by at about 3 a.m. that morning
4   to give you your medication?
5   A. No. I was gone. Excuse me. Let me think about
6   it. No. I went to infirmary --
7   Q. Okay.
8   A. -- after that.
9   Q. Let's back up.
10      At about 11:00 or thereabouts, Lieutenant
11  Stanton looked at your bruises and left?
12  A. Yes.
13  Q. What happened next?
14  A. I tried to commit suicide.
15  Q. What did you do?
16  A. I tried to hang myself in the cell.
17  Q. Explain to me exactly what you did.
18  A. I tied a sheet on the vent, and I tried to hang
19  myself up.
20  Q. All right. You tied one end of the sheet on a
21  vent?
22  A. Yeah. I tied it around my neck.
23  Q. And the other end around your neck?
24  A. Yeah.

16 (Pages 58 to 61)

Page 62

1  Q. Where was the vent?
2  A. Right above the toilet.
3  Q. Once you had tied the two ends of the sheet, what
4  did you do?
5  A. I was wrapping it around my neck.
6  Q. Then what happened?
7  A. An officer came in.
8  Q. Do you know which officer it was?
9  A. Yes. Sergeant Terhune.
10 Q. Officer Terhune?
11 A. Terhune. I don't know the last name.
12 Q. About what time was it when you were tying the
13 sheet around your neck?
14 A. About 11:30.
15 Q. So it was shortly after --
16 A. Shortly after the lieutenant left.
17 Q. Okay.
18 A. Well, not shortly. There was a time. I can't
19 remember what time. Between that time I told him to the
20 time -- about an hour, hour and a half. I can't
21 remember.
22 Q. Okay.
23 A. About an hour.
24 Q. When you tied the sheet around your neck, what

Page 63

1  was your plan? What were you going to do?
2  A. Just kill myself.
3  Q. How were you going to do that?
4  A. Just jumping off the toilet.
5  Q. So you were standing on the toilet at that point?
6  A. Yes.
7  Q. Your plan was to step off the toilet --
8  A. Yes.
9  Q. -- with the sheet around your neck?
10 A. Yes.
11 Q. I believe that what you said is that Sergeant
12 Terhune came by.
13 A. Terhune.
14 Q. How did that come to pass?
15 A. Because they saw -- they -- the officer saw me
16 pulling the sheet. When he came around, he saw me
17 pulling the sheet. And by the time they came back, they
18 saw me putting -- wrapping the other end around my neck.
19 Q. Do you know which officer saw you tying the sheet
20 around your neck?
21 A. Do I remember what officers?
22 Q. Yes.
23 A. There was like five -- four officers at that
24 time. I just remember Sergeant Terhune, because I knew

Page 64

1  who he was.
2  Q. So when Sergeant Terhune came to your cell, there
3  were other officers there as well?
4  A. Yes.
5  Q. Okay. But do you know who it was that saw you in
6  the first place that then --
7  A. No. I remember. I remember him. He was a
8  rookie. He just started working.
9  Q. So some officers saw you and then went and told
10 other people?
11 A. Yes.
12 Q. But he was a rookie.
13    You don't remember who he was?
14 A. No.
15 Q. Sergeant Terhune came to your cell with some
16 other officers?
17 A. Yes. With some other officers.
18 Q. Do you know who the other officers were?
19 A. No.
20 Q. When Sergeant Terhune came, did he open your
21 door?
22 A. Yeah. He opened the door. He came in with the
23 other officers. He ordered me to get down.
24 Q. So at that point you hadn't stepped off the

Page 65

1  toilet?
2  A. No. I was still standing.
3  Q. Sergeant Terhune told you to get down?
4  A. Yeah.
5  Q. What did you do then?
6  A. I went and got down.
7  Q. Did you untie the sheet before you --
8  A. No. The sheet was already tied. I was tying it
9  around my neck.
10 Q. Had you actually finished tying it yet?
11 A. No. I was still tying it while -- when he came
12 in.
13 Q. Okay. After you got down, I guess, from the
14 toilet, then what happened?
15 A. He handcuffed me and took me to infirmary.
16 Q. Did Sergeant Terhune actually escort you to the
17 infirmary?
18 A. No. They let the rover do that.
19 Q. Once you got to the infirmary, what happened?
20 A. I was put in -- they just took me there and they
21 sat me. They checked me out and all that. And then they
22 just left me there.
23 Q. When you got to the infirmary, was there a doctor
24 there?

17 (Pages 62 to 65)

Melendez                                v.                           Carroll, et al.
Anibal Melendez                    C.A. # 04-193-SLR                 July 14, 2005

Page 66

1    A.  A nurse.
2    Q.  Do you remember which nurse it was?
3    A.  The name?
4    Q.  Yes.
5    A.  (The witness indicated.)
6    Q.  No.
7         Okay.  When you got to the infirmary, were
8    you placed in a cell there?
9    A.  Yes.
10   Q.  Do they have a suicide watch cell there?
11   A.  Yes.  There was a suicide watch.
12   Q.  How long were you in the suicide watch cell?
13   A.  Well, when the doctor -- when the psychiatry
14   person came and spoke to me, I explained the
15   circumstances and --
16   Q.  When you say "explained the circumstances," what
17   did you say?
18   A.  I told him -- he asked me what -- you know, a
19   number of questions -- psychiatry questions -- why and
20   who was the president and some questions like that.  And
21   he asked me why.  And I told him why I wanted to kill
22   myself.  And he took me off suicide watch.
23   Q.  Okay.  What did you tell?
24   A.  I told him that I became very depressed because

Page 67

1    the incident took place.  I couldn't take it no more.
2    And I felt like they was putting too much pressure on me
3    and it was too much for me to handle at that time and I
4    wanted to end it all.
5    Q.  When you say you told him about the incident, did
6    you tell him about the assault?
7    A.  Yes.
8    Q.  Did you tell him who the officers were that
9    assaulted you?
10   A.  Not by names.
11   Q.  So you told him about what had happened but not
12   who did it?
13   A.  Yeah.  I just told him I was assaulted by
14   officers in an area where I was at and explained to him
15   everything about, you know -- he really -- they didn't
16   really -- they're not in there really to find out what
17   took place.  They're in there to find out if you mentally
18   enough -- they make sure you don't want to kill yourself
19   no more.
20   Q.  Why didn't you tell him who the officers were?
21   A.  Why?  The names?
22   Q.  Mm-hmm.
23   A.  Because he wasn't interested to know anything
24   about the officers or the assault.  He wanted -- his job

Page 68

1    is to make sure that you mentally all right to survive.
2    Q.  Okay.  When were you taken out of the suicide
3    cell?
4    A.  There are cells.  They just took me off suicide
5    watch --
6    Q.  Okay.
7    A.  -- the next day when I arrived there -- the same
8    day.
9         I arrived there around one o'clock in the
10   morning.  And later on when I saw the doctor about
11   nine o'clock in the morning, he took me off suicide
12   watch.
13   Q.  So you stayed in the same cell?
14   A.  Same cell.
15   Q.  Okay.
16   A.  But they just give you the clothes.  They give
17   you a bed.
18   Q.  How long did you stay in the infirmary?
19   A.  About three weeks.
20   Q.  When you were brought to the infirmary, did you
21   show anybody the bruises and injuries?
22   A.  Yes.
23   Q.  Do you remember who you told about that?
24   A.  The nurses who was in charge that night of the

Page 69

1    infirmary.
2    Q.  You don't remember who that was?
3    A.  The names, no.
4    Q.  I know you explained that you had bruises.
5         Did you have any cuts?
6    A.  Yes.  I had a cut on my chest.
7    Q.  Was there any bleeding at some point?
8    A.  Like -- it was not a big cut.  It was like a big
9    scratch.
10   Q.  Okay.
11   A.  At that time it was dry.  It was dry.  But it was
12   a small bleed on my chest.
13   Q.  What side of your chest was that on?
14   A.  On the right side.
15   Q.  I may have already asked you this, but I don't
16   remember.  So I'm just going to ask you again.
17   A.  That's okay.  You can ask me again.
18   Q.  When you got to the infirmary, did you show any
19   of the health care providers there your bruises and your
20   cut?
21   A.  Yeah.
22   Q.  Did they give you any treatment for those?
23   A.  They give me painkillers.
24   Q.  Do you know what they gave you?

18 (Pages 66 to 69)

Melendez                                   v.                           Carroll, et al.
Anibal Melendez                    C.A. # 04-193-SLR                    July 14, 2005

Page 70

1   A. I think it was Motrins.
2   Q. Did they do anything else for you?
3   A. Besides that, no.
4   Q. Do you know why you stayed in the infirmary for
5   three weeks?
6   A. Because I refused to go back to the tier where I
7   was assaulted.
8   Q. When you say you refused, what did that involve
9   exactly?
10  A. That I -- they ask -- as soon as they took me off
11  the suicide watch the very same day, they asked me to go
12  back to the same unit where I was assaulted. And I
13  didn't want to go back because I was fearing for my life
14  at that time.
15  Q. Did you tell anybody that?
16  A. Yes. I was telling the shrink person -- the
17  psychiatrist in charge of the infirmary.
18  Q. So it's your understanding they kept you in the
19  infirmary because you told them you didn't want to go
20  back to SHU because you were concerned --
21  A. My life -- welfare.
22  Q. -- about your safety.
23      After you were there for three weeks, what
24  happened then?

Page 71

1   A. Well, they was forcing me to go back. I didn't
2   want to go back. So they took me from that cell that I
3   was at. They took me to another cell with windows black.
4   They took me -- they stripped me of my clothes again.
5   They put a mattress on the floor and put me on suicide
6   watch again.
7   Q. In the infirmary?
8   A. In the infirmary. They have a room with window
9   blacks -- window covers.
10  Q. Let me make sure I understand this.
11      You were in the infirmary for three weeks
12  with your bedding and your clothes --
13  A. Yeah.
14  Q. -- and all that stuff.
15      After three weeks they --
16  A. After a week later -- like a few days later they
17  kept on telling me to go back. And I was like I'm not
18  going back to that unit again. I'll go to different
19  building. They got different -- in SHU they got
20  different tiers. Not to that tier. I'm not going back
21  to the same tier. They like you need to go back to the
22  same tier. I said I'm not going back to the same tier.
23  So they told me, well, we're going to have to move to
24  that room over there. And they put me in the room. They

Page 72

1   took the bed off of me. They took the clothes. They
2   took everything and put me in a room with window
3   covers.
4   Q. Were you back on suicide watch at that point?
5   A. Yes.
6   Q. How long were you in that cell on suicide watch?
7   A. Like two weeks.
8   Q. Is what you're saying that you got to the
9   infirmary and you were not on suicide watch for a week
10  and then put back on suicide watch? Is that right?
11  A. When I refused to leave.
12  Q. I see.
13      You were put back on suicide watch for two
14  weeks in the room with the blacked-out windows?
15  A. Yeah.
16  Q. Then what happened?
17  A. I couldn't take it no more. I couldn't take that
18  no more. And I told them, all right, I agree to go back
19  to the same tier.
20  Q. After you were in the suicide watch for two weeks
21  you told them, okay, I'll go back where I came from?
22  A. Correct.
23  Q. Why did you say that?
24  A. Because it was too much for me. It was -- I
        couldn't take that -- that being in a cell like that --

Page 73

1   locked down like that -- no more. Because I had a choice
2   to stay there or go back to the unit. And after I gave
3   it a thought for a few weeks, I was like take me back to
4   the unit.
5   Q. At that point did they take you back to Tier C?
6   A. They took me back to the tier.
7   Q. Were you taken back to the same cell?
8   A. No. A couple cells down.
9   Q. But still the same --
10  A. To the same tier.
11  Q. Once you were taken back to the same tier, how
12  did things go?
13  A. That's when he gave me any -- that's when he
14  refused to give me food.
15  Q. You are talking about Gardels?
16  A. Gardels.
17  Q. Did that happen just one time or more than one
18  time?
19  A. One time after that.
20  Q. Did you have any other problems with Gardels once
21  you were returned to --
22  A. He didn't give me any recreation either.
23  Q. Was that occasionally or all the time?
24  A. Well, every time he worked -- I only get to come

19 (Pages 70 to 73)

Case 1:04-cv-00193-SLR    Document 72-4    Filed 02/24/2006    Page 22 of 36

Melendez                              v.                      Carroll, et al.
Anibal Melendez              C.A. # 04-193-SLR                July 14, 2005

Page 74

1  out when -- I think it was on Tuesday -- I'm sorry. It
2  was a Tuesday or Thursday. I -- because he don't work
3  no -- we get to have rec Sunday, Tuesday and Thursday.
4  And I think he's not there on Tuesdays or Wednesdays. He
5  off Tuesdays and Wednesdays. So the only rec that I
6  really get to have with him is on a Thursday. So on the
7  Thursday that I have rec, I will get no rec.
8     Q. So on the days that he worked, he wouldn't let
9  you have rec?
10    A. No. He wouldn't.
11    Q. Okay. How long did you remain on Tier C after
12 you returned from the infirmary?
13    A. On that tier?
14    Q. Yes.
15    A. About a month.
16    Q. During that month that you were back on Tier C,
17 did you have any other problems with Gardels?
18    A. Just that.
19    Q. Did he ever come back in your cell?
20    A. No.
21    Q. Did he ever make any negative comments to you?
22    A. That he wasn't going to kill me.
23    Q. He said that he was going to kill you?
24    A. That he wasn't.

Page 75

1     Q. He said that he wasn't going to kill you?
2     A. Yeah. Because I used to be scared. That Sunday
3  I came back I had to go down steps. And I was walking a
4  little too fast, so I -- so he won't be behind me. And
5  he was like, "Don't worry. I ain't going to kill you. I
6  ain't going to throw you down the steps."
7     Q. When he said that, did you feel better about him
8  or worse about him?
9     A. Actually, he gave me the idea that he could
10 really do that.
11    Q. Did you feel that he was threatening you when he
12 said that?
13    A. Yeah. I felt threatened.
14    Q. Other than that conversation, did he ever say
15 anything else to you that you felt was threatening?
16    A. No.
17    Q. What about Officer Allen? When you went back on
18 Tier C, did you have any problems with him?
19    A. No. Not at all.
20    Q. Do you know whether in that time frame Gardels
21 only worked on Tier C?
22    A. Yeah. He worked on my tier. He -- from that
23 time I was there, he always worked that tier.
24    Q. What about Allen? Did he always work on your

Page 76

1  tier?
2     A. He worked -- he -- that was -- I think that was
3  the first time that I saw him working on that tier --
4  that incident time.
5     Q. Did you ever see him on Tier C again?
6     A. I seen him before. He do the rovering.
7     Q. Okay. After you were back on Tier C for about a
8  month, where did you go? Did you leave Tier C after you
9  came back about a month?
10    A. Yeah. I came to another tier.
11    Q. How did that happen?
12    A. Because there was a small hole in that window
13 that I was in.
14    Q. Right.
15    A. And it was a security risk. For security
16 protection they took me to another tier.
17    Q. Was Tier C full so they couldn't move you to
18 another cell?
19    A. Yeah. It was full. So they put me on another
20 tier.
21    Q. What tier was that?
22    A. D.
23    Q. Are you still on D now?
24    A. No.

Page 77

1     Q. Okay.
2     A. I'm in a different D. I'm in D tier. That was D
3  tier of Building 17. I'm in D tier of Building 21.
4     Q. Okay. So you're not in Building 17 anymore?
5     A. No.
6     Q. All right. About a month after you were released
7  from the infirmary, you were moved to D tier in
8  Building 17?
9     A. Yes.
10    Q. How long were you there?
11    A. Until now. I just moved from there.
12    Q. Okay. So you just moved to Building --
13    A. 21.
14    Q. -- 21 recently.
15       Once you were moved to D tier, did you see
16 Gardels anymore?
17    A. Yes. He worked on those two tiers -- C and D.
18 He's -- the officers are assigned to two tiers.
19    Q. Oh.
20    A. Because the building is in -- the building is
21 four tiers. And it's pretty much -- it's kind of divided
22 in two. Like some people charge on -- they in charge of
23 A and B. And the officer in charge on C and D. So he
24 was pretty much assigned to C and D.

20 (Pages 74 to 77)

Case 1:04-cv-00193-SLR    Document 72-4    Filed 02/24/2006    Page 23 of 36

Melendez                              v.                        Carroll, et al.
Anibal Melendez                 C.A. # 04-193-SLR               July 14, 2005

Page 78

1    Q. So you were still --
2    A. Seeing him.
3    Q. Once you were moved to D, did you have any more
4    problems with him -- with Gardels?
5    A. Well, after I filed the claim -- that was when I
6    was on C tier. I filed a claim. And he was coming
7    around D tier and telling everybody that I was a snitch.
8    Q. So when you were still on C before you were
9    moved, you filed something --
10   A. A claim.
11   Q. -- about -- you mean a grievance or --
12   A. No. I filed a claim.
13   Q. Oh. The lawsuit that we're here about today?
14   A. Yeah.
15   Q. Oh, all right.
16         While you were still on C --
17   A. On C Tier.
18   Q. -- you filed this lawsuit?
19   A. Yes.
20   Q. Then you were moved to D?
21   A. D.
22   Q. Gardels was going around talking about you?
23   A. Yeah. He was telling all the other inmates that
24   I'm a snitch.

Page 79

1    Q. What else, if anything, did he do?
2    A. That's it.
3    Q. How about your meals and recreation?
4    A. No. He just -- he didn't give me rec. There was
5    once he didn't give me any rec.
6    Q. One time? Is that right? You said one time?
7    A. Yes. Just once.
8    Q. Once you were on D tier?
9    A. Yeah. When I was on D tier.
10   Q. Did he give you your meals?
11   A. No. He wouldn't take no meals.
12   Q. He gave you your meals. He didn't --
13   A. Yeah. He wasn't taking. Yeah. He was giving.
14   Q. He was feeding you?
15   A. He was feeding me. Yeah, he was feeding me.
16   Q. Once you were on D tier in Building 17, did you
17   have any other problem with Gardels that you haven't told
18   me about?
19   A. (The witness indicated.)
20   Q. Is that a no?
21   A. No.
22   Q. What about Allen? When you were moved to D tier,
23   did you have any problems with Allen?
24   A. No. I never had a problem before that with Allen

Page 80

1    or after that.
2    Q. It was just that one incident?
3    A. That one incident with Allen.
4    Q. How did you find out Gardels' name?
5    A. I think I asked him.
6    Q. So at some point you asked him what his name was
7    as opposed to being called "Nuke"?
8    A. Yes.
9          THE WITNESS: Do you mind telling me the
10   time?
11         MS. KELLY: Okay. Do you need a break?
12         THE WITNESS: Yes.
13         MS. KELLY: We're probably going to take a
14   while longer. I'm not almost done yet. So it might be a
15   good time to take a break.
16         We can go off now.
17         (A recess was taken.)
18            - - - - -
19         ANIBAL MELENDEZ, resumes
20   BY MS. KELLY:
21   Q. You testified that when Gardels and Allen
22   assaulted you that they injured you in various ways by
23   kicking and punching you. Is that right?
24   A. Yes.

Page 81

1    Q. Did those injuries go away at some point?
2    A. No.
3    Q. Okay.
4    A. The bruises.
5    Q. Did the bruises clear up at some point?
6    A. Mm-hmm.
7    Q. You still have bruises?
8    A. Oh. To this day?
9    Q. Yes.
10   A. Oh, no.
11   Q. Okay. The bruises went away. They cleared up.
12         At some point you didn't have bruises
13   anymore. Is that right?
14   A. Well, yes.
15   Q. They went away?
16   A. Yeah, they went away.
17   Q. How long did it take before the bruises went
18   away?
19   A. When I left the infirmary, about three weeks.
20   Three weeks.
21   Q. Would you say --
22   A. Before I leave the infirmary, I still had little,
23   tiny bruises, but not much. It was about three weeks.
24   Q. Okay. At this time are you having any physical

21 (Pages 78 to 81)

Page 82

1   problems that you feel were caused by that assault?
2   A. Yes. Neck.
3   Q. Tell me about that.
4   A. It got stiff and pain. And I couldn't turn
5   properly. My neck was hurting.
6   Q. When did you start having problems with your
7   neck?
8   A. Prior to the time I was in the infirmary.
9   Q. You're talking about before the time you were
10  brought to the infirmary because of the sheet incident?
11  A. After the -- after -- when I was in the infirmary
12  at that time, I was waking up with the problems.
13  Q. So while you were in the infirmary, you started
14  having problems with your neck?
15  A. Yeah.
16  Q. You're still having problems with your neck
17  today?
18  A. Yes.
19  Q. How is your neck feeling today?
20  A. When I turn, it feels like a pain, like a sharp
21  pain.
22  Q. Where is the sharp pain?
23  A. All on this. On this.
24  Q. On the back?

Page 83

1   A. In the back.
2   Q. Is it in the middle of the back? In the middle
3   part?
4   A. On the side.
5   Q. Both sides or one side?
6   A. Both sides.
7   Q. Okay. Have you told any medical provider here at
8   the prison about your neck problems?
9   A. I told Nurse Bryant afterwards. She told me just
10  take a Tylenol.
11  Q. So you told Nurse Bryant that your neck was
12  bothering you?
13  A. Yeah.
14  Q. Do you remember when that was?
15  A. When I came back from the infirmary.
16  Q. You mean when you came back to the tier?
17  A. To the tier.
18  Q. Does Nurse Bryant work in the infirmary?
19  A. No.
20  Q. So she just works on the tiers?
21  A. Yes.
22  Q. Did you talk to any other health care person at
23  DCC about your neck?
24  A. Well, when I first came to infirmary, I -- they

Page 84

1   was giving me painkillers when I first got there.
2   Afterwards they stop giving me the painkillers. And I
3   start feeling the pain. And I got moved afterwards.
4   Q. You mean you got moved back --
5   A. To the tier. To the tier.
6   Q. Once you were back on the tier, have you ever
7   told anybody about your neck problems?
8   A. Well, I wrote up a few grievance about the neck
9   incident and my head. And they wasn't treating me.
10  They're not treating me. I did write a few people about
11  it.
12  Q. Have you talked to any of the medical people here
13  about your neck?
14  A. The doctor. I spoke to the doctor.
15  Q. Do you know who that was?
16  A. No.
17  Q. So you told the doctor that you were having
18  problems with your neck. Right?
19  A. (The witness indicated.)
20  Q. Do you tell him how your neck got hurt?
21  A. Yes.
22  Q. What did you say?
23  A. Well, they asked me.
24  Q. Okay.

Page 85

1   A. I tell them I'm having neck problems. You have
2   to write a medical sick call slip. And I wrote it down.
3   They -- the nurse, she -- the nurse do the check. And
4   she referred the case to the doctor. And the doctor saw
5   me. And he said there's nothing wrong with your neck.
6   She put the hand on my neck. She made me turn my head up
7   and down and just say okay.
8   Q. This was a woman doctor?
9   A. A woman doctor.
10  Q. Do you remember about when you saw her? Was it
11  this year or last year? Do you remember when it was?
12  A. This is 2005.
13  Q. 2005.
14  A. I was still in the SHU. And I left the SHU --
15  well, Building 17. I just left there -- I can't really
16  remember what time. I was still over there in 17.
17  Q. At any time did anyone at medical do anything for
18  you with respect to your neck?
19  A. No. They didn't do anything. They just took
20  x-rays.
21  Q. I can't remember what you said.
22  Did you tell them that you had been
23  assaulted?
24  A. Well, I go there and they check me and all. And

22 (Pages 82 to 85)

Case 1:04-cv-00193-SLR    Document 72-4    Filed 02/24/2006    Page 25 of 36

Melendez                              v.                      Carroll, et al.
Anibal Melendez                  C.A. # 04-193-SLR           July 14, 2005

Page 86

1  then after I was checked, they asked me what was your
2  problem and like, well, how it happen. I explain how it
3  happen. And they don't say nothing. They don't say
4  nothing, period.
5    Q. Does your neck hurt you every day?
6    A. Yeah, every day.
7    Q. Okay. Are you able now to get Tylenol or
8  anything like that? Do you have to get special orders?
9    A. Yes. I got to request -- put a sick call slip
10  asking about the neck. And they just started giving me
11  Tylenol every day.
12    Q. So you get Tylenol every day?
13    A. No. I don't. No. If I get the -- it's going to
14  be every day for -- I don't know how long. I'm still
15  having this problem. So I just don't take no Tylenol. I
16  stay with the pain.
17    Q. Okay. When was the last time you put in a sick
18  call request about your neck?
19    A. Well, I just went there right before I got moved
20  to this building. They -- I went to the doctor. They
21  checked me for my neck. They took x-rays. They told me
22  there was nothing wrong and sent me back to the building.
23    Q. Did they prescribe any Tylenol or anything?
24    A. No.

Page 87

1    Q. When was the last time you took Tylenol?
2    A. For my pain?
3    Q. Yes.
4    A. I can't remember.
5    Q. Do you remember when was the last time you put in
6  a sick call slip about your neck?
7    A. It was before I moved to Building 17, because you
8  can't -- once you put in -- you can't keep putting in
9  sick call slip, sick call slip over and over and over
10  again. You've got to wait. Once you put in a sick call
11  slip, the nurse check you. And they refer to the doctor.
12  And you are on the waiting list to see the doctor. And
13  there's no need to keep on putting sick call slip over
14  and over again, because they're going to keep telling you
15  it's already referred to the doctor. So you just have to
16  wait on the doctor --
17    Q. Okay.
18    A. -- on a waiting list.
19    Q. But you're not on a waiting list to see a doctor
20  about your neck right now?
21    A. No. I already did. I saw the doctor a few
22  months ago.
23    Q. Is that when the x-ray was done?
24    A. Yes.

Page 88

1    Q. Do you know what the x-ray show?
2    A. No. They didn't show it to me.
3    Q. Do they do x-rays here?
4    A. Yes.
5    Q. Is Building 21 part of SHU?
6    A. Yes, yes. It's part of the SHU.
7    Q. In this lawsuit you are claiming that you were
8  harmed by the assault involving Gardels and Allen.
9    A. Yes. That's correct.
10    Q. We just talked about how your neck still hurts.
11    A. Yes.
12    Q. Are there any other problems or injuries that you
13  feel were caused by that assault?
14    A. Maybe.
15    Q. You just can't think of anything right now?
16    A. No. It's not anything. It's just I don't -- I'm
17  not sure. That's why.
18    Q. Okay.
19    A. I'm not sure. When I lay on my back, my head
20  starts to hurt.
21    Q. Like a headache?
22    A. Yeah.
23    Q. Okay. Is what you're saying that you have some
24  other problems but you can't say for sure what caused

Page 89

1  them?
2    A. I haven't give any -- I put a -- I requested to
3  see the doctor on that issue and everything like that,
4  but they haven't identified what the problem is. So I
5  cannot really be sure the problem. So I cannot speak on
6  that future.
7    Q. Other than, let's see, the headache, can you
8  think of any other problem --
9    A. No.
10    Q. -- you feel might have been caused by the
11  assault?
12    A. No.
13    Q. Other than Allen and Gardels, were there any
14  other people that saw that assault?
15    A. You mean witnesses?
16    Q. Right. Yes. Witnesses.
17    A. There may have been.
18    Q. But can you tell me anybody?
19    A. Yes. There's about two people that I know of.
20    Q. Okay. Were they officers or inmates?
21    A. Inmates.
22    Q. Now, did they see it or hear it? Do you know
23  what happened?
24    A. They could see part of it and hear part of it.

23 (Pages 86 to 89)

Page 90

1    Q.  Is that through their windows?
2    A.  Through -- they can see when the person go in --
3    whoever --
4    Q.  Okay.
5    A.  Gardels and Allen gone in. They can see the
6    first attack or whatever. I'm not sure. But they can
7    see when they go in. And they can hear the noises being
8    made by the blows.
9    Q.  Did you have a chance after the incident happened
10   to talk about what happened --
11   A.  Yes.
12   Q.  -- with people?
13   A.  Yes.
14   Q.  Do you want to tell me who they are?
15   A.  Do I have to?
16   Q.  Well, let me put it this way.
17   A.  Right now I haven't -- right now I can't have
18   contact with -- right now where I'm at and where they
19   at -- I'm still in lockdown, so I would not be able to
20   speak to that person --
21   Q.  Okay.
22   A.  -- yet.
23       So right now, no.
24   Q.  Let me explain it to you.

Page 91

1        Say, for example, this case were to go to
2    trial and you wanted to bring people to trial to talk
3    about what happened. You would need to tell me in
4    advance who those people were. I mean, you can't show up
5    with people and surprise me.
6    A.  No. I wouldn't. Yeah. I would have to inform
7    you.
8    Q.  Right.
9        What you're saying is you want to talk to
10   them first before you --
11   A.  No. I don't know -- I haven't speak to them, so
12   I don't know if they want to come forward with the
13   incident or they'd rather not. So people -- sometime
14   they don't want to get involved in this type cases. So
15   I'm not sure whether I should bring the names to you to
16   have them come by choice and all the conflicts.
17   Q.  Okay. Do you have any way of getting in touch
18   with them at all here?
19   A.  No.
20   Q.  Can you write to them?
21   A.  No.
22   Q.  All right. I'm going to write you a letter
23   asking you to give me the names of any witnesses that you
24   might want to present --

Page 92

1    A.  Okay.
2    Q.  -- at trial.
3        There will be at some point -- and this may
4    be decided by the judge -- where you can't bring up new
5    names, because it will be too late.
6    A.  Yeah.
7    Q.  Okay.
8    A.  Well, I would love to mention them.
9    Q.  I mean, you can tell me if you want to.
10   A.  Well, yes. Okay. I will tell you. Brian
11   Stewart and Curtis Evans.
12   Q.  Do you know, are they still at DCC?
13   A.  Yes. They still here.
14   Q.  It sounds to me like you don't know yet whether
15   you would use them at trial or whether they would be
16   willing.
17   A.  I'm just like --
18   Q.  You don't know what they're --
19   A.  What it is -- to make sure who's going to be a
20   witness -- and I have to verify --
21   Q.  Right.
22   A.  -- with the person first --
23   Q.  Right. Exactly.
24   A.  -- to make sure that they are coming forward or

Page 93

1    they not, you know. I have to subpoena them or whatever.
2    Q.  Right.
3    A.  And I don't really want to push nobody --
4    volunteer.
5    Q.  Right.
6    A.  I would like to have some type of way to speak to
7    these persons. I don't know if it's by court or -- I
8    don't know how should I do that yet.
9    Q.  Well, I can't really give you any suggestions on
10   that, but what I'm going to tell you is that, until you
11   tell me that they're your witnesses, I won't take steps
12   to depose them. The reason is I don't want to create
13   problems here for you.
14   A.  Exactly. That's what I'm not trying to do.
15   Q.  Okay.
16   A.  I'm trying to speak to them face-to-face.
17   Q.  You need to figure out --
18   A.  How. Right. But I'm still waiting on a list to
19   be moved where I'm at.
20   Q.  Okay.
21   A.  So, hopefully, I can get moved and I'll be able
22   to walk around more and have more access to --
23   Q.  Okay.
24   A.  --the law library.

24 (Pages 90 to 93)

Melendez                                              v.                                    Carroll, et al.
Anibal Melendez                          C.A. # 04-193-SLR                                 July 14, 2005

Page 94

1     And I may be able to come forward with them
2   soon --
3     Q. Okay.
4     A. -- just by the time allow to.
5     Q. All right. I'm not going to --
6     A. Yeah. I'm not trying to expose them yet.
7     Q. Right.
8     A. But I will in time.
9     Q. Okay. What I'll probably do is send you a letter
10  asking you to let me know who your witnesses are. If
11  you're not going to use them at trial, then I really have
12  no reason to go ask them questions.
13    A. I mean, at this point I want to do it the right
14  way.
15    Q. All right. You need to sort this out, and we'll
16  follow it up from there.
17    A. Yeah.
18    Q. Other than those two people that you named, do
19  you know if there are any other people who could verify
20  what you said happened -- who could say, yes, that
21  happened? Or are those the two people?
22    A. Yeah.
23    Q. That's it?
24    A. Yeah.

Page 95

1     Q. Okay. I'm going to go over a couple of documents
2   with you now.
3         MS. KELLY: I'm going to mark this as No. 2.
4         (Melendez Deposition Exhibit No. 2 was
5   marked for identification.)
6   BY MS. KELLY:
7     Q. All right. Mr. Melendez, I'm going to show you
8   what has been marked as Deposition Exhibit 2. All that
9   means really is that when the transcript is done up this
10  will be attached.
11    A. Yes. I have a copy of this.
12    Q. Okay. I need for you to look that over. Tell me
13  when you've had a chance to look it over so I can ask you
14  some questions about it.
15    A. Mm-hmm.
16    Q. If you look at page 2, is that your handwriting?
17        I'm talking about the page with the --
18    A. Yes.
19    Q. -- handwriting.
20        You wrote that document?
21    A. Yes.
22    Q. You prepared that?
23    A. Mm-hmm.
24    Q. Now, is this a grievance talking about the

Page 96

1   incident that we're here today about?
2     A. Yes.
3     Q. What happened with this grievance, if you know?
4     A. It was fast-forward to me with this case on the
5   front --
6     Q. Okay.
7     A. -- that I cannot request any disciplinary action
8   to any staff.
9         But as you're aware, the bottom, they ask
10  you Action Requested by Grievance. I did not request any
11  disciplinary action against any defendant.
12    Q. Okay.
13    A. So I couldn't really understand what they was
14  saying. And also they refer me to write to Captain
15  Sagers about the incident. And I did wrote to Captain
16  Sagers about the incident.
17    Q. What happened after you wrote to Captain Sagers?
18    A. Nothing happens.
19    Q. You didn't hear anything back from him?
20    A. No. A wrote a few like this. I don't know if
21  you have a copy of.
22    Q. You wrote a few grievances?
23    A. Yes.
24    Q. About?

Page 97

1     A. About the same incident.
2     Q. About the assault?
3     A. Yeah. About the assault and about the food.
4     Q. Okay.
5     A. And recreation.
6         MS. KELLY: I'm going to mark this as
7   Exhibit No. 3.
8         (Melendez Deposition Exhibit No. 3 was
9   marked for identification.)
10  BY MS. KELLY:
11    Q. I'm going to show you what's been marked as
12  Exhibit 3. Look that over and tell me if you've ever
13  seen that before.
14    A. No. I have never seen it before, but that was
15  exactly what I explained to you.
16    Q. So this is talking about the incident that we are
17  here today about -- about the incident when you put the
18  sheet around your neck?
19    A. Yes.
20    Q. Okay. If you look at the bottom, it says
21  Individuals Involved. It mentions Terhune.
22    A. Yes. That's her.
23    Q. If you read the Description of Incident, which is
24  the paragraph at the top --

25 (Pages 94 to 97)

Case 1:04-cv-00193-SLR    Document 72-4    Filed 02/24/2006    Page 28 of 36

Melendez                                    v.                              Carroll, et al.
Anibal Melendez                      C.A. # 04-193-SLR                        July 14, 2005

Page 98

1   A. Yes.
2   Q. -- do you agree with that -- that that's
3   basically what happened?
4   A. Yes.
5        MS. KELLY: I'm going to mark this as No. 4.
6        (Melendez Deposition Exhibit No. 4 was
7   marked for identification.)
8   BY MS. KELLY:
9   Q. Mr. Melendez, look this over. This is Exhibit
10  No. 4. Read it over. Let me know when you're done.
11  A. Okay. What was the question?
12  Q. Have you ever seen this before?
13  A. No.
14  Q. I want you to look at the description here.
15       Tell me, do you remember this incident?
16  A. Yes, I remember the incident.
17  Q. Okay. Is the description accurate in terms of
18  what you remember?
19  A. Well, when they wrote the disciplinary report,
20  the disciplinary hearing officer found that it was
21  inaccurate. And they found me not guilty on this
22  write-up.
23  Q. So --
24  A. It was not accurate. They found me not guilty.

Page 99

1   Q. So you were charged on a disciplinary --
2   A. A disciplinary hearing, yes.
3   Q. -- for disorderly or threatening behavior.
4   A. For disorderly or threatening behavior.
5   Q. It went to a hearing?
6   A. Yes.
7   Q. You were found not guilty?
8   A. Not guilty.
9   Q. The date on this is October 9, 2003. Right?
10  A. October 9.
11  Q. Okay.
12  A. Yes.
13  Q. Did you have any kind of incident with Gardels on
14  that date, if you remember? I'm not talking about, you
15  know, whether what is said here is true or not. But did
16  you have some kind of incident with him at all on that
17  date?
18  A. He didn't want to give me any bread.
19  Q. We have talked today about the incident where he
20  didn't give you bread and then came back and assaulted
21  you.
22  A. Before it happened?
23  Q. But this was different?
24  A. Different.

Page 100

1   Q. Okay. What parts of this description are not
2   true in your opinion?
3   A. What part is not true?
4   Q. Right.
5        Maybe this will be easier. Is any of it
6   true or any of it accurate in your view?
7   A. If I get to put it together, it would be a lot of
8   stuff just taken out of it. Yes. Because it's not
9   right.
10       MS. KELLY: Mark this as the next exhibit.
11       (Melendez Deposition Exhibit No. 5 was
12  marked for identification.)
13  BY MS. KELLY:
14  Q. This is Exhibit 5. Just look this over and let
15  me know if you've seen it before.
16  A. Mm-hmm.
17  Q. Have you seen this before?
18  A. No.
19  Q. Do you remember this incident?
20  A. Yes. I remember the incident.
21  Q. Okay. What happened with the disciplinary
22  charges in this incident?
23  A. I can't remember.
24  Q. Do you know if you went to a hearing on it?

Page 101

1   A. Yeah. I think I had a hearing. I'm not sure.
2   But most likely, yes, I did.
3   Q. Okay.
4   A. Because it's meant to have a hearing on this type
5   of write-up.
6        MS. KELLY: I'm going to mark this as the
7   next exhibit.
8        THE WITNESS: But does this have anything to
9   do with this case?
10       MS. KELLY: No. I mean, the factual
11  allegations in here are not, you know, about Gardels or
12  the date that we were talking about.
13       THE WITNESS: They are?
14       MS. KELLY: They're not.
15       THE WITNESS: Oh, they're not. Oh, okay.
16       MS. KELLY: Again, these are, you know --
17       THE WITNESS: They're write-ups since I'm
18  behind this prison.
19       MS. KELLY: These are write-ups. Again, you
20  know, this is something we might discuss with the judge
21  about whether it would come in at trial.
22       Today we talked about all different kinds of
23  things that may or may not have anything to do with the
24  trial ultimately. Do you understand that?

26 (Pages 98 to 101)

Melendez                              v.                         Carroll, et al.
Anibal Melendez                  C.A. # 04-193-SLR                July 14, 2005

Page 102

1  THE WITNESS: Do I have to speak about this
2  stuff that happened before?
3  MS. KELLY: What you can do is you can
4  object.
5  THE WITNESS: Okay.
6  MS. KELLY: Then you need to answer. Then
7  what would happen is, if it were to the trial date and --
8  say, for example, I said to the Court I want this to come
9  in at trial. Then you would make your argument why it
10  shouldn't. Then the judge would decide. So if you want
11  to object --
12  THE WITNESS: Yes. I want to object to
13  anything that happened before -- any other write-ups that
14  I have in this prison --
15  MS. KELLY: Okay.
16  THE WITNESS: -- that are not related to
17  this charge.
18  MS. KELLY: Okay. Mr. Wilcox has put that
19  on the record.
20  THE WITNESS: Okay.
21  MS. KELLY: That's what's called preserved
22  if and when we go to trial.
23  Did I say that clearly?
24  THE WITNESS: Yes, you did.

Page 104

1  A. If you have anything under 17 -- anything under
2  18 points, you are allowed to leave the building. And,
3  you know, at that time -- at one time I guess my points
4  was over 17. So I was held in the SHU on this write-up
5  that I was having with the Defendant Gardels. And -- but
6  at one time my points went down to 12 and I was still
7  held in the SHU.
8  Q. Are your points down to 12 now?
9  A. Now. They've been 12 for...
10  Q. When you're talking about disciplines involving
11  Gardels, are you talking about the incident that we're
12  here about today or something else?
13  A. Well, when -- he'll refuse to give me any food.
14  Like Exhibit 4. He'll write me up for it. I will get a
15  write-up. And that will give me extra points -- add
16  three points, as a matter of fact -- three points for
17  this write-up.
18  Q. Okay. Assuming that you were found guilty?
19  A. Assuming that, yeah, I would be found guilty.
20  And I think there was another write-up that he gave me
21  for refusing recreation.
22  Q. I'm going to show you --
23  A. Refusing recreation. I had some points for that
24  too.

Page 103

1  (Melendez Deposition Exhibit No. 6 was
2  marked for identification.)
3  BY MS. KELLY:
4  Q. Okay. Take a look at this. Let me know in
5  you've seen that before.
6  A. Mm-hmm.
7  Q. Now, did this happen when you were in the
8  infirmary?
9  A. Yes.
10  Q. For the incident that we're here about today?
11  A. Yes.
12  Q. Do you remember what happened with these charges?
13  A. No, I don't.
14  Q. Do any of your disciplinary charges affect your
15  housing placement, you know, your classification?
16  I'm trying to find out: Is it your
17  understanding that your disciplines have anything to do
18  with why you're put on SHU?
19  A. Well, I had a few discipline with Officer Gardels
20  that held me back -- kept me at SHU.
21  Q. Okay.
22  A. But not all the disciplinary action kept me in
23  SHU. It was -- the SHU, since then, has gone by points.
24  Q. Right.

Page 105

1  MS. KELLY: Can you mark these as the next
2  three exhibits, whatever their numbers are?
3  (Melendez Deposition Exhibit Nos. 7 through
4  9, respectively, were marked for identification.)
5  BY MS. KELLY:
6  Q. These are Exhibits 7, 8 and 9. I want you to
7  look these over. From my understanding of them, they all
8  seem to involve Officer Gardels. Just to give you an
9  idea, I wanted to know if these were the incidents that
10  you were talking about that gave you more points. So
11  take your time. Let me know when you've had a chance to
12  look those over.
13  A. Yes. That's one. Yes. Yes.
14  Q. So are those the disciplines that you are talking
15  about in terms of causing you more points?
16  A. Yes.
17  Q. Did you feel with respect to those disciplines
18  that Gardels was singling you out, or was it just a
19  coincidence?
20  A. I'm sorry. I didn't hear the question.
21  Q. Well, let me see.
22  In terms of these disciplines that you're
23  looking at, which are Exhibits 7 through 9, these are all
24  about Gardels. Is that right?

27 (Pages 102 to 105)

Case 1:04-cv-00193-SLR    Document 72-4    Filed 02/24/2006    Page 30 of 36

Melendez                                    v.                          Carroll, et al.
Anibal Melendez                      C.A. # 04-193-SLR                  July 14, 2005

Page 106

1    A. Yes.
2    Q. In those disciplines did you feel that Gardels
3    was picking on you, or do you feel like --
4    A. Yes. He was picking on me.
5    Q. The lawsuit that we're here about today, are you
6    complaining about these disciplines with Gardels or just
7    about the assault?
8    A. Well, the lawsuit is based on the assault that
9    took place -- the assault and battery. But I guess this
10   is part of it.
11   Q. How so?
12   A. Because he was -- well, what I mean about that is
13   that -- okay. After the -- after and before the
14   assault -- I don't know if you have any before. No. I
15   think before -- he was already --
16   Q. Here's one.
17       If you look at --
18   A. -- messing with me.
19       He was already -- before -- everything here
20   is after.
21   Q. If you look at Exhibit 4.
22   A. This is Exhibit 6. Oh, 4. Oh, this is before
23   the incident. That's it. But everything else after --
24   yes. He was having -- picking on me.

Page 107

1    Q. Okay. That was your feeling?
2    A. That's what it shows.
3    Q. Those disciplines we were just talking about,
4    Exhibits 7, 8 and 9, do you remember what happened with
5    those?
6    A. Yes. I was found guilty, I think.
7    Q. Okay.
8    A. I'm not sure -- I'm not a hundred percent sure.
9    Q. Okay.
10   A. But most likely, yes, I was found guilty.
11   Q. Do you know if those charges would have added
12   points to your classification?
13   A. Yes. They do. They give you points for this.
14   About three points each.
15   Q. Three points each?
16   A. Yes.
17   Q. Now, we've talked today about how on the day of
18   the assault you had tied a sheet around your neck.
19   A. Yes.
20   Q. Had you ever had any other incidents where you
21   tried to harm yourself in that way?
22   A. Not that I can recall.
23   Q. Do you remember an incident in January of 2001 at
24   Gander Hill where you were found with a sheet around your

Page 108

1    neck?
2    A. Oh, yes.
3    Q. Okay. What was that about?
4    A. That was so long ago. I can't remember. That
5    was a long time ago.
6        You said '99?
7    Q. 2001. January 2001.
8    A. Oh, yeah. That's correct.
9    Q. Do you remember an incident in May of 2001 at
10   Gander Hill where you were brought to the infirmary
11   because your girlfriend told the police that you were
12   suicidal? Do you remember anything like that?
13   A. Yes. I remember.
14   Q. What was that about? What happened?
15   A. I didn't understand what was going on. I was
16   charged with -- or discharged. And they had to evaluate
17   the person after being charged with a type of crime like
18   this. And they say my girlfriend called. And I asked
19   her. She said she didn't call no one. And after
20   resolved all this, I ended up in the infirmary.
21   Q. Okay.
22   A. But most likely it was about the charges because
23   I was evaluated.
24   Q. You were evaluated by psychological --

Page 109

1    A. Yes. A person, yeah.
2    Q. Because of the nature of the charges?
3    A. The nature of the charges.
4    Q. Have you ever taken any medication for depression
5    or anxiety?
6    A. Not that I remember.
7    Q. Do you remember a situation where a Captain Henry
8    was concerned that you were depressed or stressed out or
9    anything like that?
10       This would have been --
11   A. I was in the infirmary.
12   Q. -- In 2002, December of 2002.
13   A. Well, she spoke to me about -- when they was
14   trying to put me back on the tier where the assault took
15   place, I spoke to her about the incident. I'm not sure
16   she was aware about my depression part. She was more
17   listening to what took place and what I wanted to be
18   done. And that's all I can remember.
19   Q. Who is Captain Henry?
20   A. Captain Henry? She's -- I'm not sure her
21   position, but most likely she's assigned to -- she's a
22   captain.
23   Q. Does she have anything to do with SHU?
24   A. That's what I'm not sure. I'm not sure.

28 (Pages 106 to 109)

Melendez                                    v.                          Carroll, et al.
Anibal Melendez                    C.A. # 04-193-SLR                    July 14, 2005

Page 110

1    Q. So did you tell her about your concerns about
2    your safety?
3    A. Yes, I did.
4    Q. Do you remember whether you told her that it was
5    Gardels and Allen that you had concerns about?
6    A. Yes. I did.
7    Q. When you were up on the toilet and attempting to
8    tie the sheet around your neck, did you fall down?
9    A. When I was in the toilet?
10   Q. When you were standing on the toilet.
11   A. No, I did not. They ordered me to.
12   Q. To get down?
13   A. To get down.
14   Q. How many buildings are there that are a part of
15   SHU?
16   A. As of right now, four.
17   Q. Okay.
18   A. What I mean "as of right now" is that Building 21
19   is considered part of the SHU also.
20   Q. But it wasn't before?
21   A. It wasn't before.
22   Q. Is that a flow-down building?
23   A. They say it's a flow-down, but it's not treated
24   as a flow-down.

Page 111

1    Q. Okay.
2    A. A flow-down building is where people are waiting
3    to be moved somewhere else. But they need to have as
4    much privilege as much as any other building. But it's
5    not. It's treated as a SHU.
6    Q. Okay. Now, as I said when we first began, there
7    are a number of individuals in this lawsuit that I
8    represent. What I want to do is I want to go over each
9    of them. Tell me what you feel that they did --
10   A. Okay.
11   Q. -- improperly -- how you feel that they are
12   responsible in this lawsuit.
13   A. Okay.
14   Q. Now, you've already told me what Officer Gardels
15   did. Is there anything that you haven't told me about
16   Gardels that you want to tell me now?
17   A. As far as what?
18   Q. You've told me many things about Officer Gardels
19   today that you felt that he did towards you that were not
20   proper. Are there any other things that you feel that he
21   did in terms of your lawsuit that you haven't told me
22   yet?
23       Basically, this is your chance to tell me
24   whatever it is about your lawsuit that you haven't

Page 112

1    already said. Now we're talking about Gardels.
2    A. Well, he just -- Gardels is a very mean person.
3    If he have a problem with you, if he don't like you, he
4    will try and -- he will make it -- it will be his day.
5    He will come to work to pick on you all day every day.
6    That would be his -- pretty much his day. That would be
7    pretty much his day. He would come to work and make sure
8    he will make you miserable that eight hours that he's in
9    the building. He will keep on picking on you about
10   everything. He won't give you no food. He won't give
11   you no bread. He will pretty much have his way with you.
12   Q. Is there anything else you want to tell me about
13   him --
14   A. Not at this time.
15   Q. -- relative to your lawsuit?
16       Okay. What about Officer Allen? You told
17   me about his role on the assault on you. Is there
18   anything else you're complaining about him in your
19   lawsuit? You need to --
20   A. No.
21   Q. I was going to say that you need to answer so
22   that the court reporter can get it down.
23   A. Yes. Okay.
24   Q. I think that you mentioned today Captain Sagers.

Page 113

1        What role, if any, does Captain Sagers have
2    in your lawsuit?
3    A. Captain Sagers is the captain assigned to
4    Building 72 -- building to the SHU. He makes sure --
5    he's the supervisor of every staff member in the SHU.
6    And he -- Captain Sagers is -- he's the supervisor of the
7    building. He's the supervisor. He makes sure that --
8    you know, everybody got to go through Captain Sagers.
9    Q. Now, he didn't have any involvement with the
10   assault. Was he there? Did he see it?
11   A. Not -- no.
12   Q. Did you tell him about the assault?
13   A. Yes. I wrote him.
14   Q. Now I remember how his name came up.
15       I think what you said is that after your
16   grievance --
17   A. After my grievance -- well, most of my grievance
18   was addressed to Captain Sagers. And when a grievance is
19   addressed to that person, that person has to take action.
20   Q. Take action?
21   A. Action to cure the incident or to prevent the
22   incident. And Captain Sagers is in charge of that
23   position. And Captain Sagers -- after I wrote him and
24   the grievance was addressed to him, he refused to pretty

29 (Pages 110 to 113)

Melendez                                        v.                              Carroll, et al.
Anibal Melendez                          C.A. # 04-193-SLR                       July 14, 2005

Page 114

1  much do anything about the whole incident.
2      Q.  I can't remember what you said before.
3          Did you ever talk to Captain Sagers about
4  the incident?
5      A.  No.  I was addressed to Captain Sagers once
6  through Lieutenant Seacord.  One of the grievances was
7  addressed to Lieutenant Seacord.  Lieutenant Seacord was
8  not in charge of that type of situation, so he addressed
9  the whole case to Captain Sagers.  But I never spoke to
10  Captain Sagers.
11     Q.  Okay.  When you say Lieutenant Seacord was in
12  charge --
13     A.  Well, no.  It was addressed to him.  And he
14  couldn't -- it was above the -- the incident was above
15  his job.  He needed to address that to Captain Sagers.
16  And Captain Sagers never did anything about it.
17     Q.  All right.  Tell me if I'm wrong.
18         Are you saying that your grievance about
19  Gardels and Allen was sent to Seacord first?
20     A.  Once.
21     Q.  Okay.
22     A.  Once before it was sent to Seacord.
23     Q.  But then it was sent up to Captain Sagers?
24     A.  Because it was above Seacord.

Page 116

1      Q.  Okay.  So you're saying that you told Belanger
2  and that you had been assaulted?
3      A.  Yes.  I told him when he came by that I was
4  assaulted at this time, this day, this, this and that.
5  And he looked at me and pretty much turned around and
6  kept going.
7      Q.  Other than that conversation, did you have any
8  other discussion with him about what happened?
9      A.  I think he should have -- I trusted he should.
10     Q.  So your claim against him is that you told him
11  what happened?
12     A.  He failed to do his job.
13     Q.  He didn't do anything.  Is that your point
14  against him?
15     A.  Yes.
16     Q.  Is there anything else about Captain Belanger
17  that you haven't told me?
18     A.  Captain Belanger pretty much just is a criminal
19  as we are.
20     Q.  Say that again.
21     A.  He's just as criminal as we are.
22     Q.  What do you mean by that?
23     A.  He used to come to work with house arrest.
24     Q.  Say that again.

Page 115

1      Q.  Other than what you've just told me, do you have
2  any other facts or claims against Captain Sagers?
3      A.  Beside that he failed to do his job?
4      Q.  Right.
5      A.  That's pretty much it.
6      Q.  I don't remember us talking about Captain
7  Belanger at all.  Tell me what you feel that he did in
8  this case.
9      A.  Well, Captain Belanger is not a captain anymore.
10     Q.  Right.
11     A.  He's a sergeant.  He was shift commander, you
12  know.  He came to the infirmary.
13     Q.  Say that again.
14     A.  He came to the infirmary --
15     Q.  Oh.
16     A.  -- after the incident.
17         And I told him.  And he just didn't say
18  anything.  He didn't do anything.
19     Q.  He came to the infirmary, and you spoke with him
20  about the assault.  Is that right?
21     A.  Yes.
22     Q.  Did you give him the names of the officers
23  involved?
24     A.  I'm sure I did.

Page 117

1      A.  He used to come to work in house arrest.
2      Q.  What do you mean?
3      A.  In house arrest.  He had an ankle bracelet on
4  his --
5      Q.  Oh.  He would come to work on --
6      A.  House arrest.
7      Q.  He was under house arrest?
8      A.  Yeah.
9      Q.  Okay.
10     A.  And --
11     Q.  I guess he was under a kind of house arrest where
12  you could come to work.
13     A.  I mean, I think all house arrest you're able to
14  work.
15     Q.  Say that again.
16     A.  I think all house arrest you're able to work.
17     Q.  So you could go from home to work but nowhere
18  else?
19     A.  I mean, I think you should know about house
20  arrest.
21     Q.  I should?
22     A.  Yes.  I think.
23     Q.  Because I'm a lawyer?
24     A.  Well, sometimes you stipulate to stuff to --

30 (Pages 114 to 117)

Melendez                                    v.                          Carroll, et al.
Anibal Melendez                      C.A. # 04-193-SLR                  July 14, 2005

Page 118

1   Q.  Oh.
2   A.  -- the person.
3   Q.  I don't do criminal law.  That's why I'm asking
4   you questions --
5   A.  Oh.  You're not?
6   Q.  -- and I sound like I don't know what I'm talking
7   about.
8           I don't do criminal law.
9   A.  Oh, I'm sorry.  You make me feel like a fool
10  here.
11  Q.  No.
12  A.  I'm sorry.
13  Q.  Let me explain.  I'm in the civil division of the
14  attorney general's office.
15  A.  Oh.
16  Q.  So when people like you sue for money damages --
17  A.  Yeah.
18  Q.  -- or that kind of thing, then I represent the
19  people that you sued.  That's all I do.
20  A.  Okay.
21  Q.  So, hopefully, if I were a prosecutor, I would
22  know more about house arrest than I do.
23  A.  Yeah.  You make me feel that small.
24  Q.  No.  You made me feel that small, because I

Page 119

1   didn't know what house -- I know what house arrest --
2   A.  Because I thought -- I didn't know you was
3   assigned to this lawsuit only.
4   Q.  Right.
5   A.  I thought that you had a lot of criminal.
6   Q.  No.  I have a lot of lawsuits like your lawsuit.
7   A.  Oh, okay.  Okay.  I'm sorry.
8   Q.  No, no, no.  I know what an ankle bracelet is.
9   A.  Yeah.  Belanger -- he -- the last time I heard he
10  was doing weekends --
11  Q.  Okay.
12  A.  -- somewhere.
13  Q.  Okay.  Is there anything else you want to tell me
14  about him?
15  A.  No.
16  Q.  Now, you sued Lise Merson as well.
17  A.  Who?
18  Q.  The corporal.
19  A.  The grievance chairperson.
20  Q.  The grievance chair.
21  A.  Mm-hmm.
22  Q.  Tell me what is your basis of your case against
23  her.
24  A.  That she did not address -- when I address all

Page 120

1   the grievance to her, she was supposed to go and address
2   the issue.
3   Q.  So your claim against her is that she's the
4   grievance chair and received your grievances?
5   A.  She received them, but she never addressed the
6   issue.
7   Q.  Did you ever have any conversation with her
8   directly about your situation?
9   A.  No.  Not once I spoke to her.
10  Q.  Other than the fact that she's the grievance
11  chair, do you have any other complaints?
12  A.  About her?  Uh-uh.
13  Q.  Okay.  All right.  You also named Internal
14  Affairs --
15  A.  Yes.
16  Q.  -- as a defendant.
17      What's the basis of that claim?
18  A.  I wrote them concerning what was going on before
19  the incident, and they failed to investigate the
20  complaint.
21  Q.  What did you write to them about?
22  A.  About that I wasn't getting food, recreation --
23  stuff like that.
24  Q.  So you wrote to them before you talked about

Page 121

1   Gardels?
2   A.  About Gardels and a few other officers.
3   Q.  Did you get any response?
4   A.  No.
5   Q.  Did you write to Internal Affairs about any other
6   issues?
7   A.  Just this issue here.
8   Q.  So you wrote to them after the assault?
9   A.  After the assault I also wrote them.
10  Q.  Okay.  You told them about the assault?
11  A.  Yes.
12  Q.  Did you mention the names of the officers?
13  A.  Not quite.  I can't remember.  That happened a
14  couple years ago.  But I might have.
15  Q.  Did you get any response on your letter?
16  A.  No.  No response.
17  Q.  Did you write to them on any other occasion about
18  the lawsuit issues that we're here to discuss?
19  A.  Well, just I would write them about the incident.
20  Before the incident happened they never wrote me back.
21  Q.  Okay.  Do you remember how many times you wrote
22  to Internal Affairs?
23  A.  No.  I can't remember how many times.
24  Q.  It was at least twice?

31 (Pages 118 to 121)

Melendez                                    v.                          Carroll, et al.
Anibal Melendez                        C.A. # 04-193-SLR                 July 14, 2005

Page 122

1   A.  At least twice.
2   Q.  Do you have any other claims against Internal
3   Affairs?
4   A.  No.
5   Q.  Did you ever speak to anyone from Internal
6   Affairs?
7   A.  No.
8   Q.  So you just wrote to them?
9   A.  I wrote.
10  Q.  Now, what's the basis of your claims against
11  Deputy Warden McGuigan?
12  A.  McGuigan?
13  Q.  I wasn't sure how to pronounce that, which is,
14  again, something I should know.  But what are the bases
15  of your claims against him?
16  A.  I wrote him.  I wrote him.  He's the warden --
17  deputy warden in charge of the SHU.
18  Q.  Okay.
19  A.  The SHU -- you know, he's responsible for
20  anything that goes on in the SHU.
21  Q.  You wrote to him about --
22  A.  I wrote about the incident, before the incident,
23  after the incident.
24  Q.  Did you ever get a response?

Page 123

1   A.  No response.
2   Q.  Other than your letters to the deputy warden, do
3   you have any other facts or claims against him?
4   A.  Other than he failed to do his job.
5   Q.  Did you ever speak with him?
6   A.  No. Never.
7   Q.  Okay.
8   A.  Never. Never. Not once.
9   Q.  What about your claims against Warden Carroll?
10  A.  Also the same thing as Mr. McGuigan.
11  Q.  Did you write to the warden?
12  A.  I wrote the warden before and after.
13  Q.  Did you get any response?
14  A.  No.
15  Q.  Did you ever speak to the warden?
16  A.  No.
17  Q.  Other than what you've just told me, do you have
18  any other complaints about Warden Carroll?
19  A.  He's an irresponsible person.
20  Q.  By that, what do you mean?
21  A.  That he don't take -- that he's not responsible
22  doing his job. He's not taking his job seriously enough.
23  In fact, if I'm not mistaken, that person that just died
24  got killed -- that kidnapping incident -- was requesting

Page 124

1   to see captain -- I mean Warden Carroll. And he refused
2   to come down.
3   Q.  You mean the inmate that was shot in relationship
4   to Cassandra Arnold?
5   A.  That got shot, yeah. I'm not sure -- but most
6   likely he request to -- well, let me correct that. Can
7   you somehow move to strike that?
8   Q.  Just say "motion to strike," and he'll write it
9   down.
10  A.  I think he requests to speak to the warden at
11  that time, and he refused to come down. So he don't do
12  his job.
13  Q.  Okay. Is there anything else you want to tell me
14  about your claim against the warden?
15  A.  No.
16  Q.  Now, at some point you amended your complaint to
17  add claims against Nurse Bryant.
18  A.  Stanton and Bryant.
19  Q.  We've had some discussion about whether or not
20  they have been served.
21  A.  Yes.
22  Q.  Okay.
23  A.  I served them. To my knowledge, I sent the
24  U.S. Marshal to the court. Of course, they didn't

Page 125

1   receive it.
2   Q.  Okay. That will be something that apparently, I
3   think, needs to be resolved with the Court.
4   A.  So do I have to file -- now, I'm not asking for
5   any legal advice. But in this case do I have to file an
6   amended complaint again?  Because I wrote them.  I don't
7   know if they get it.  What it is, I'm not sure if they
8   receiving the mail that I sent to them.  So I did -- I
9   amended the complaint again to see if they can just grant
10  that, and I haven't heard anything back from the court.
11  Q.  Is this something you did recently?
12  A.  I did that like a month ago.
13  Q.  Oh, okay.
14  A.  And I haven't heard anything back.
15  Q.  Well, that's kind of beyond what I know about and
16  can help you with. But what I'd like to do while I'm
17  here -- I know you told me that Lieutenant Stanton came
18  by your cell shortly after the assault.
19  A.  Yes. And he said okay.
20  Q.  Is that the basis of your claim against him?
21  A.  The basis of my claim against Mr. Stanton is that
22  he was the lieutenant in charge of the tier, and when I
23  informed him of the incident, he brushed it off.
24  Q.  Okay. Is there anything else that you feel like

32 (Pages 122 to 125)

Melendez                                          v.                              Carroll, et al.
Anibal Melendez                          C.A. # 04-193-SLR                        July 14, 2005

Page 126

1   Lieutenant Stanton did?
2      **A. No.**
3      Q.  Do you understand that even if Nurse Bryant was
4   brought into the case that I wouldn't represent her?  Do
5   you understand that?
6      **A. Yes.**
7      Q.  Okay.
8      **A. But if she be back in the case, she would be**
9   **represented. Right?**
10     Q.  No.  Medical care --
11     **A. Is somebody else?**
12     Q.  Yes.  Medical care at the prison is provided by a
13  separate --
14     **A. A separate doctor. I remember you said. I'm**
15  **sorry.**
16     Q.  I think at that time it would have been First
17  Correctional Medical, but I'm not a hundred percent sure.
18  But the entity that provides medical care here at the
19  prison is called an independent contractor.  It's a
20  separate company.  The people that provide medical care
21  are not employees of the state.
22     **A. They wrote us a couple times concerning that.**
23  **You explained that to me.**
24     Q.  Right.

Page 127

1      **A. I appreciate that. I got all the information.**
2   **I'm just not aware if the court receive, because I wrote**
3   **them -- because you -- I send the same copies to you and**
4   **to all parties. And you send me yours back saying you're**
5   **not taking -- the marshal -- because they haven't been**
6   **served with the --**
7      Q.  Right.
8      **A. Okay. So I send them back to the court. And I**
9   **sent a copy with the copy you sent to me -- the letter**
10  **you sent to me, I sent a copy to them informing them,**
11  **yes, I did send the U.S. Marshal to some -- it has been a**
12  **mistake by the prison or somewhere. By I know they**
13  **should grant it, because, you know, -- to serve -- I**
14  **don't know about the rules in Delaware, but to serve, the**
15  **U.S. Marshal is supposed to be what? 120 days?**
16     Q.  I'm not sure about that.
17     **A. Well, they gave me 30 days, and they say I failed**
18  **to serve them. And I informed them that I did send it to**
19  **them. I don't know what happened. And I'm not sure if**
20  **there's any way that I -- I don't know what's going on.**
21     Q.  Right.  That's something I really can't help you
22  with.  I know that it's an open issue.
23          Lieutenant Stanton is an employee of the
24  Department of Corrections.  So if at some point he is

Page 128

1   brought into the case and served, I would represent him.
2   So since we're here today, I wanted to ask you about him.
3      **A. Yes.**
4      Q.  Even if Nurse Bryant is brought into the case,
5   she would have a separate lawyer.
6      **A. We need to speak about him.**
7      Q.  Yes.
8          What I'm going to do is I'm just going to
9   look over my notes and see if there's anything that I've
10  forgotten.
11         MS. KELLY:  We're going to go off the record
12  for a minute.
13  BY MS. KELLY:
14     Q.  Mr. Melendez, I don't have any more questions for
15  you today.  If you would like, if there's anything that
16  you want to tell me about your lawsuit that you haven't
17  already told me, this is the time to do it.  You don't
18  have to.  I'm just asking you: If you have anything else
19  you want to say, this is your opportunity.
20     **A. I think everything has pretty much been said and**
21  **done.**
22         MS. KELLY:  Okay.  All right.  We can go off
23  the record.
24         (The deposition concluded at 1:40 p.m. this

Page 129

1   same day.)
2
3          - - - - -
4
5          INDEX TO TESTIMONY
6
7   ANIBAL MELENDEZ                        PAGE
    Examination by Ms. Kelly                 2
8
9
           - - - - -
10
11
           INDEX TO EXHIBITS
12
    MELENDEZ DEPOSITION EXHIBIT NO.               PAGE
13
    1  Sketch drawn by deponent              32
14  2  Three-paged document entitled Memorandum      95
       to Inmate Melendez from Corporal Merson
15     dated Monday, January 5, 2004
    3  Document entitled Incident Report     97
16     bearing Incident No. 1007392
    4  Document entitled Disciplinary Report 98
17     bearing Disciplinary No. 1004679
    5  Document entitled Disciplinary Report 100
18     bearing Disciplinary No. 1004087
    6  Document entitled Disciplinary Report 103
19     bearing Disciplinary No. 1005958
    7  Document entitled Disciplinary Report 105
20     bearing Disciplinary No. 1010282
    8  Document entitled Disciplinary Report 105
21     bearing Disciplinary No. 1010283
    9  Document entitled Disciplinary Report 105
22     bearing Disciplinary No. 1010284
23
24         - - - - -

33 (Pages 126 to 129)

Melendez
Anibal Melendez

v.
C.A. # 04-193-SLR

Carroll, et al.
July 14, 2005

Page 130

1
2
3
4
5
6
7          REPLACE THIS PAGE
8
9          WITH THE ERRATA SHEET
10
11         AFTER IT HAS BEEN
12
13         COMPLETED AND SIGNED
14
15         BY THE DEPONENT.
16
17
18
19
20
21
22
23
24

Page 131

State of Delaware )
        )
New Castle County )
        CERTIFICATE OF REPORTER
        I, Robert Wayne Wilcox, Jr., Registered
Professional Reporter and Notary Public, do hereby
certify that there came before me on the 15th day of
July, 2005, the deponent herein, ANIBAL MELENDEZ, who was
duly sworn by me and thereafter examined by counsel for
the respective parties; that the questions asked of said
deponent and the answers given were taken down by me in
Stenotype notes and thereafter transcribed into
typewriting under my direction.
        I further certify that the foregoing is a true
and correct transcript of the testimony given at said
examination of said witness.
        I further certify that I am not counsel,
attorney, or relative of either party, or otherwise
interested in the event of this suit.


                Robert Wayne Wilcox, Jr.
                Certification No. 101-RPR
                (Expires January 31, 2008)


DATED: July 16, 2005

34 (Pages 130 to 131)